935 P.2d 911

In re the Marriage of: Clinton Charles **TALIAFERRO**, Petitioner–Appellant,

and

**Robert A. Hirschfeld, Real Party in Interest, Non–Party Appellant,**

v.

Johanna Antonia **TALIAFERRO**, Respondent–Appellee.

No. 1 CA–CV 93–0547.

Court of Appeals of Arizona, Division 1, Department A.

Nov. 19, 1996.

Review Denied April 29, 1997.

334

Robert A. Hirschfeld, Attorney [1], Phoenix, for Petitioner–Appellant and In Propria Persona.

Martin D. LaPrade, Phoenix, for Respondent–Appellee.

Phoenix Arizona Civil Liberties Union by Walter Cheifetz, Phoenix, Amicus Curiae.

1. In June 1995 the supreme court suspended Hirschfeld from the practice of law; his briefs in this case were filed before then.

NOYES, Judge.

Clinton Taliaferro ("Father") appeals from a decree of dissolution of marriage. His attorney, Robert A. Hirschfeld, appeals from a $20,000 sanction. In a previous opinion, we vacated both the decree and the sanction on grounds that the trial court had erroneously denied Father's notice of change of judge. *Taliaferro v. Taliaferro,* 184 Ariz. 613, 911 P.2d 619 (App.1995). The supreme court then vacated our decision on grounds that "rulings by noticed judges on the propriety of the notice are reviewable only by way of special action relief." *Taliaferro v. Taliaferro,* 186 Ariz. 221, 222, 921 P.2d 21, 22 (1996). The case was remanded to this Court for "consideration of all other issues properly raised on appeal." *Id.* at 224, 921 P.2d at 24. Having considered those issues, we now affirm the decree but vacate the $20,000 sanction on grounds that it was excessive and, therefore, an abuse of discretion. We remand for imposition of a just and appropriate sanction on Hirschfeld for the cited violation.

We have jurisdiction of the appeal pursuant to Arizona Revised Statutes Annotated ("A.R.S.") section 12–2101(A) (1994).

## CUSTODY and VISITATION

■ The parties were married in August 1987 and their son was born in May 1988. The marriage was dissolved in August 1993, following years of hostilities and a six-day trial in which each party tried to prove that the other was emotionally unstable, an abusive spouse and an unfit parent. Father was 51 years old and disabled, Mother was 29 years old and employed, and Child was 5 years old and emotionally damaged by the behavior of his parents.

Father argues on appeal that the trial court abused its discretion in awarding custody to Mother and supervised visitation to Father. The trial court's findings and conclusions on the custody issue are supported by the record and are as follows:

9) Joint Custody is not in the minor child's best interest for the following reasons:

a) The total lack of the parents' ability to cooperate in the decision-making process concerning the child;

b) The acts of domestic violence committed by the Petitioner [Father] in the presence of [Child and step-child].

c) The ongoing "war" between the parties; and

d) Neither of the parties is likely to allow the child frequent and continuing contact with the other parent.

10) The Petitioner is not fit to have sole custody of the minor child for the following reasons:

a) The Petitioner is an alcoholic with severe emotional problems.

3) In November of 1992 the Petitioner believing he was having a heart attack, drove to the hospital with the minor child in the automobile. At the hospital a blood alcohol test was performed. The reading was .258.

5) The [May 1993] suicide attempt was because Petitioner believed he was going to lose custody of his child; and

6) The Petitioner has been verbally abusive to his son and his step-son.

12. [Mother] is a fit and proper person to have the care, custody and control of [Child].

13. The Court is not unmindful of the fact that both parents have wrongfully caused the minor child to suffer emotional trauma, and that both parents are in need of hostility reduction counseling.

14. In Exhibit 2, the records of Thunderbird Samaritan Hospital, the following statement is noted: "... he [Father] is denying any suicidal thoughts to me, however, he has been on the telephone [with his attorney] and his sitter in the room reported that the patient stated that he needed a gun and was crying and was agitated...." [Report of Psychiatric Consultation, dated May 25, 1993.]

Because of the Petitioner's habits of driving in an intoxicated condition with the minor child in the automobile and the potential for violence, it would be in the minor child's best interest that the Petitioner be granted supervised visitation....

Father argues on appeal that the trial court should have awarded joint custody as recommended by Pat Ferguson, who studied this family and found neither parent fit for sole custody. Ferguson has a Master's degree in Sociology, Marriage and Family Life, was a custody supervisor and assistant director of Conciliation Court for twelve years, and has been in private practice for six years. She did recommend joint custody, but only to "balance the power" and only because she believed that whichever parent received sole custody would deprive the other of any contact with the child. Ferguson's written report, in part, is as follows:

### SYNOPSIS

... During the course of this evaluation Mr. and Mrs. Taliaferro have continued to wage war. Both claim to have been physically assaulted by the other. Mail has been stolen, property damaged, threats made, allegations of child physical and sexual abuse have been made, phone messages intercepted and deliberate programming of [Child] was done by both parents.

. . . .

Since [Child] has been in the custody of Johanna, Clint has not received visitation with [Child] except for one visitation held at my office....

Both parents take good physical care of [Child], but seemingly they haven't a clue as to what is needed for [his] emotional and psychological well-being.

. . . .

Both Johanna and Clint see themselves as victims and take little responsibility for their own actions in continuing the battle. Hopefully, the damage done to [Child] is not irreparable.

### RECOMMENDATIONS

I do not consider either parent capable of being the sole custodial parent, therefore, I am recommending joint custody in the hope that this will balance the power struggle between the parents.

. . . .

The parents should receive hostility reduction counseling. If the battle continues, the parent causing the first problem should lose custody and have the most minimum visitation possible.

In her testimony, Ferguson referred to the deplorable behavior that occurred the entire year that I saw these people. [Child] was increasingly under stress.... I see this couple as being locked in a very heavy power struggle to have control. And unfortunately the only thing they have to use against one another is their child ... and I think the power struggle has taken priority over what is in the best interests of the child.... This child is going to be in therapy until he's 35 if we can't get the fighting stopped.

. . . .

You know, they are both good parents in their own way and the child loves both of them. That's not the problem. The problem is their continued infighting. It doesn't make any difference to me who raises the child. This is a neat little boy that I would like to have a future.

Ferguson also found that, although each parent was accusing the other of threats, "I do not think that either one of these parents presents a danger physically to [Child] at all." When the trial court asked Ferguson for a sole custody recommendation, she stated: "I think if you could safeguard by your order that visitation to the other parent never be interrupted or changed or withheld, probably Johanna is more rational than Clint is."

The trial court acted within its discretion in declining to order "balance of power" joint custody and in deciding to award sole custody to Mother with supervised visitation to Father.

### FINANCIAL ORDERS

■ Father argues that he should have been awarded spousal maintenance and that the trial court erroneously attributed to him income from his mother, who had paid $24,000 on the parties' house; made all mortgage payments ($800 per month), bought much of the furniture, and paid over $40,000 for Father's attorney's fees in this case. The court also found that, although Father received

disability benefits of $425 per month, "he is capable of gainful employment." The court attributed gross monthly income of $1,425 to Father and $1,215 to Mother. Neither party was awarded spousal maintenance. Father was ordered to pay child support of $383 per month.

Father had problems from a 1967 plane crash and a 1985 industrial accident. He had three back surgeries in the early 1980's, has a "foot drop," and has been on Social Security disability since 1988 because he cannot stand or sit for long. Father also has a college degree. On August 3, Father testified that "I have never not tried to find employment," and he blamed his inability to find a job on "unspoken age bias." Although Father testified on August 5 that he did not feel capable of being employed, the record supports the trial court's finding that Father was employable. Father had prior experience in accounting and computer programming and a fairly solid work history since 1965. We sustain the child support award, not on grounds that Father's 80–year–old mother was going to support him, but on grounds that the record supports the conclusion that Father was capable of producing gross income of $1,425 per month. For these same reasons, we affirm the spousal maintenance decision.

If, despite Father's best efforts, the trial court's 1993 opinion of Father's employability has been disproved by time and circumstance, Father's remedy is to seek modification of his support obligation. The Decree orders that "every twenty-four (24) months the parties shall exchange financial information such as tax returns, financial affidavits and earnings statements."

Father claims entitlement to compensation because Mother dropped him from her health insurance. Because Father receives Medicare benefits when necessary, the trial court did not err in finding that "Petitioner has failed to establish that he will be damaged by the Respondent's unilateral cancellation of the Petitioner as an insured under her medical insurance policy."

## HIRSCHFELD SANCTIONS

■ Hirschfeld was Father's third attorney in the case and the parties were at war long before he appeared in February 1993. On May 23, 1993, Father was hospitalized following an overdose of prescription medication. Hirschfeld went to the hospital while Father was still unconscious, then later talked with him on the telephone. Hirschfeld notified the Phoenix City Court of the hospitalization and requested a continuance of Father's upcoming assault trial, but Hirschfeld did not disclose the hospitalization to court or counsel in this case. On the eve of trial, Mother's attorney, Martin D. LaPrade, learned of the hospitalization and filed a motion for release of medical records. Hirschfeld did not oppose the motion and the trial court ordered the hospital to release Father's records to LaPrade. On later reviewing the records, the trial court fairly characterized the event for which Father was hospitalized as an "attempted suicide." This "event" was fully explored during trial.

At the end of trial, on August 6, the trial court announced a $20,000 sanction of Hirschfeld and verbally issued the following preliminary findings and conclusions to explain the sanction:

> In the opinion of the Court, and the Court so finds, and Mr. Hirschfeld so testified that he had an obligation to disclose the hospitalization to opposing counsel.
>
> In this Court's opinion and the Court so finds that not only has Mr. Hirschfeld engaged in unethical conduct, his conduct is reprehensible because what he did was he placed four people in jeopardy, and by that I mean, Mrs. Taliaferro, the two children, and her significant other.
>
> And the reason why I say that is I'm looking now at the ... report of psychiatric consultation dated May 25th, 1993, and I quote ... he is denying any suicidal thoughts to me. However, he had been on the telephone, and a sitter in the room reported the patient stated he needed a gun and was crying and was agitated.
>
> Having ... attempted suicide because he felt he was going to lose custody of his child, and now in effect having lost custody of his child, there is a substantial likelihood

that he could kill, he could kill himself and the four others mentioned.

. . . .

Mr. Hirschfeld's conduct, in the Court's opinion, is so outrageous and reprehensible, and having informed the court that he has received [$20,000] in attorney's fees, as and for attorney's fees and costs, it is the order of the Court that Mr. Hirschfeld is assessed . . . as and for sanctions slash attorney's fees the sum of $20,000.

. . . .

Mr. LaPrade, upon receipt of the $20,000, is to petition the Court and the Court will set a hearing, and out of the $20,000, Mr. LaPrade will first be paid his attorney's fees and the balance will be paid to the Clerk of the Superior Court.

. . . .

MR. LAPRADE: Do you intend to address the issue of the husband's contribution towards the wife's attorney's fees? THE COURT: I said that the $20,000 is going to be used first to pay your attorney's fees and the balance is going to go to the Superior Court.

The trial court directed LaPrade to submit proposed findings and conclusions, and he did so. On August 13, however, the court advised in a minute entry that it declined to sign counsel's proposed findings and conclusions and would prepare its own. On August 24, the trial court filed its 29–page Amended Findings and Conclusions which, in some respects, are narrower and less severe than the verbal findings provided when the $20,000 sanction was announced, and are as follows:

30. Respondent's Motion for Sanctions

. . . .

f) The Petitioner attempted suicide because he believed he was going to lose custody of the parties' minor child.

g) Mr. Hirschfeld knew that pursuant to Rule 26.1, [Arizona Rules of Civil Procedure], he had a duty to disclose the hospitalization of May 23, 1993.

h) Mr. Hirschfeld did not intend to disclose the hospitalization at the trial.

i) The reason Mr. Hirschfeld did not intend to disclose the hospitalization was because he knew it would be extremely damaging to his client's chances of prevailing on the custody issue.

j) Mr. Hirschfeld by intentionally withholding this information, which he knew had to be disclosed, attempted to perpetrate a fraud on the Court.

Mr. Hirschfeld's conduct is without excuse, mitigation or justification.

k) Without knowing of the hospitalization, the Court may have found the Petitioner's statement that he has not ingested alcohol since January 7, 1993 to be credible, and would not have known of the Petitioner's propensity for violence if he lost on the custody issue. Mr. Hirschfeld's failure to disclose the information would have placed the child in jeopardy.

l) Mr. Hirschfeld has received TWENTY THOUSAND ($20,000.00) DOLLARS as and for attorney's fees and costs.

m) Because of the egregious conduct on the part of Mr. Hirschfeld, it would be appropriate that Mr. Hirschfeld be ordered to pay to the Respondent the sum of TWENTY THOUSAND ($20,000.00) DOLLARS, as and for attorney's fees/sanctions which is to be apportioned as follows: The Respondent is to be reimbursed for her reasonable attorney's fees and costs, and the balance, if any, is to be paid to the Clerk of the Superior Court. Rules 16(f), 26(f), and 26.1, Arizona Rules of Civil Procedure.

In opposing the sanctions, Hirschfeld argues on appeal that the suicide attempt was an "event" and that Rule 26.1 does not "encompass disclosure of an event." In open court, however, when the trial court asked Hirschfeld if he agreed that the suicide attempt was relevant to child custody, Hirschfeld said: "In retrospect, yes, I would agree at this time." We, too, agree that an attorney in a custody dispute cannot properly fail to disclose that his client was hospitalized for an attempted suicide shortly prior to trial.

Hirschfeld argues against the sanctions by counter-attacking: He accuses the trial court of "outrageous and deplorable conduct." The record does not support that accusation. Hirschfeld argues that the trial court evidenced "personal displeasure with having to

hear a fully contested trial." Hirschfeld, mainly, gave reason for any such displeasure by incessantly dwelling on argumentative cross-examination and pointless, negative direct examination.

During trial, the court repeatedly stated that negative testimony was not helping decide the custody issue. Such advice suggests that the court was focused on relevant issues but the parties were not. For example, on July 26, the trial court said: "The person that summed it up is Pat Ferguson who said both parents engaged in deplorable behavior as relates to the child. So let's move on to the substantive issues." On July 27, after Father said he only hit Mother once, after she cut him with a knife, the trial court interjected: "Mother Theresa married Jeffrey Dahmer, Mahatma Gandhi married Bonnie and Clyde and if you think this is going to help me decide this case, you're wrong.... And the reason I'm saying that is—where reality lies as relates to these accusations on both sides, only God knows." Incredibly, Hirschfeld's next question to Father was this: "Has Johanna kicked you in the genitals?" Remarkably, the trial court let it go.

On August 3, after Hirschfeld continued to elicit negative testimony from Father about Mother, the trial court called a recess and left the bench. On returning, the court advised:

> I just want to give you my impressions ... [B]oth parties have in all probability committed acts of domestic violence against the other. It is impossible for this Court to determine who is the culprit in these situations.
>
> . . . .
>
> Going through this isn't helping me decide what is in the best interest of this child.

On August 4 the trial court did cut off Hirschfeld's cross-examination of Mother, but only after enduring twenty-seven pages of argumentative, objectionable questions, such as the following:

> Q: Besides the people involved with you, who do you feel are Clint's enemies?
>
> . . . .

> Q: And you feel that Pat Ferguson is off the wall; is that correct?
>
> . . . .
>
> Q: So [Child] lies; is that correct?
>
> . . . .
>
> Q: So were you lying then or lying now?
>
> . . . .
>
> Q: It's true, isn't it, that you would use whatever reason you can to be sure that the child cannot be with Clint including that he be in jail; isn't that true?
>
> . . . .
>
> Q: Isn't it true you wanted Sam to create a situation where you could get Clint arrested for hitting Sam?
>
> . . . .
>
> Q: But isn't it true you lied in obtaining medical attention in order to get money out of an insurance company?
>
> . . . .
>
> Q: Did you or did you not tell Pat Ferguson that you married Clint to get into the United States?
>
> THE COURT: Who cares.
>
> . . . .
>
> Q: Wouldn't it be much simpler if Clint were dead right now for you and for your dealings with the courts and everything else?
>
> THE COURT: That's a ridiculous question. I'm sustaining my own objection. Your time's up. You may step down.

The record supports the court's decision to sanction counsel for failing to disclose the suicide attempt and the record does not support counsel's accusations against the court. The question now becomes whether the record supports a $20,000 sanction.

## AMOUNT OF SANCTIONS

■ Our standard of review is whether the trial court abused its discretion. *Standage v. Jaburg & Wilk*, 177 Ariz. 221, 229, 866 P.2d 889, 897 (App.1993), and *James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing & Fire Protection*, 177 Ariz. 316, 319, 868 P.2d 329, 332 (App.1993). In his motion for sanctions, LaPrade argued that, if the overdose

had been disclosed, Mother "would undoubtedly have avoided substantial attorney's fees incurred in the trial of this matter due to the incredibly damaging nature of the information." LaPrade requested an award of "all attorney's fees and costs in the preparation of trial of this matter;" he avowed that Mother's fees through trial were $12,555. LaPrade's hourly rate was $150 and he billed 40.5 hours after May 1993, which means that Mother incurred fees of $6,075 after Father's overdose. About $1,000 of those fees were caused by the discovery violation for which Hirschfeld received a $20,000 sanction.

We find no support for the argument that disclosure of Father's suicide attempt would have settled the custody issue or significantly simplified the trial. Father was not about to give up his custody fight; his despair over possibly losing custody was what drove him to a suicide attempt. And these people were fighting over more than just the custody issue. Evidence of the overdose was significant to visitation and counseling issues, true, but we do not agree that it made any impact on the custody decision. The attempted suicide was but one of Father's problems. At the end of the trial, the court stated: "With all these problems, how [Father] could realistically think he would be granted custody by any Court is beyond me." We agree that it is unlikely that any court would have granted Father sole or joint custody even if he had not attempted suicide in May 1993.

Furthermore, considering the mental health issues raised by the behavior of both parties, Father's overdose was not as remarkable as it would have been in most cases. The overdose did not even change Ferguson's joint custody recommendation: After reviewing the hospital records, she testified that,

> I believe Clint made the suicide attempt out of desperation of not seeing [Child]. He's exceptionally close to [Child]. He loves this child a great deal, and I do not believe that he would willingly put this child in any kind of jeopardy if he had him during this [recommended week-on, week-off] period of time.

(Because of the overdose, Ferguson recommend psychological counseling for Father as a prerequisite to visitation with Child.)

Mother's brief on appeal devotes only one page to defending the sanctions award and cites only *Standage* and *James, Cooke*, each of which involved Rule 11 sanctions. *See* Ariz. R. Civ. P. 11(a). In *Standage*, attorney Allen was sanctioned $30,000 for filing the latest "in a series of what can only be classified as vexatious lawsuits brought by Standage." 177 Ariz. at 223, 866 P.2d at 891. In affirming, this Court found that, "[t]he record is replete with information that the claims made by Allen on behalf of Standage were unsubstantiated and frivolous." *Id.* at 229, 866 P.2d at 897. Many of Standage's claims had already been resolved against him in another lawsuit. *Id.* at 229–30, 866 P.2d at 897–98. Whereas the *Standage* attorney was sanctioned for filing and prosecuting a frivolous lawsuit, Hirschfeld was sanctioned for failure to disclose one "event" in a non-frivolous lawsuit in which the parties were at war with one another long before he appeared.

The authorities cited by the trial court for sanctioning Hirschfeld were discovery rules, namely, Rules 16(f), 26(f), and 26.1(g), Arizona Rules of Civil Procedure. Rule 16(f) provides:

> (f) **Sanctions.** If a party or attorney fails to obey a scheduling or pretrial order, . . . the judge, upon motion or the judge's own initiative, shall, except upon a showing of good cause, make such orders with regard to such conduct as are just. . . . In lieu of or in addition to any other sanction, the judge shall require the party, or the attorney representing the party, or both, to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorneys' fees, or payment of an assessment to the clerk of the court, or both, unless the judge finds that the noncompliance was substantially justified, or that other circumstances make an award of expenses unjust.

Rule 26(f) provides that, "[t]he court shall assess an appropriate sanction including any order under Rule 16(f) against any party or attorney who has engaged in unreasonable,

groundless, abusive, or obstructionist conduct."

Rule 26.1(g) provides that, "[i]f a party or attorney fails to comply with the provisions of this rule, the court upon motion of a party or on the court's own motion shall make such orders with regard to such conduct as are just, including any of the orders provided in Rule 16(f)."

■■■ The sanctions authorized by these Rules are discretionary but the Rules provide that the sanctions are to be "appropriate" and "just," which means that they are to bear some relationship to the violation. The same is true for Rule 11, which authorizes an "appropriate sanction." In *James, Cooke*, this Court affirmed a Rule 11 sanction but did not review the amount of the sanction because pertinent transcripts were not part of the record. 177 Ariz. at 321, n. 7, 868 P.2d at 334, n. 7. The court noted, however, that Rule 11 sanctions should be limited to those reasonably incurred to meet the groundless, bad-faith moves of the sanctioned attorney, citing *Rathbun v. Warren City Schools (In re Ruben)*, 825 F.2d 977, 990 (6th Cir.1987). It is well-settled that "Rule 11 is not a fee shifting statute." *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 553, 111 S.Ct. 922, 934, 112 L.Ed.2d 1140 (1991) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 409, 110 S.Ct. 2447, 2462, 110 L.Ed.2d 359 (1990)). As a general rule, the sanction for a Rule 11 violation should bear some relationship to the expenses directly caused by the sanctionable conduct. *See Jennings v. Joshua Indep. School Dist.*, 948 F.2d 194, 199 (5th Cir.1991), *cert. denied* 504 U.S. 956, 112 S.Ct. 2303, 2304, 119 L.Ed.2d 226 (1992). The same is true for sanctions imposed pursuant to Rules 16, 26, or 26.1.

The $20,000 sanction of Hirschfeld was less related to his discovery violation than it was to the fees he had been paid for representing Father. The express intent of the sanction was to forfeit Hirschfeld's entire $20,000 attorney's fee. We conclude that this forfeiture cannot be sustained on the findings made or the rules cited by the trial court. Father had a right to be represented at trial, Hirschfeld had a right to be paid for his services, and Father had some legitimate complaints and concerns about Mother. Hirschfeld was not cited for filing and prosecuting a frivolous action; he was not cited for any claim made in the action; he was not cited for anything he said or did during trial; he was cited for one discovery violation which was cured during trial. Hirschfeld's discovery violation was very serious, but it has to be considered in context and punished fairly.

We fully understand why the trial court was alarmed that an attorney had failed to disclose that a custody contestant was recently in the hospital for a suicide attempt and was overheard asking for a gun. When the trial court announced the $20,000 sanction on August 6, it stated that Hirschfeld's deception had "placed four people in jeopardy" because "there is a substantial likelihood that [Father] could kill, he could kill himself and the four others mentioned." We find it significant, however, that when the trial court issued its Amended Findings and Conclusions two weeks after making those preliminary statements, it did not repeat the "substantial-likelihood-to-kill" findings. Because Hirschfeld, Father, and Pat Ferguson all gave evidence or argument to the effect that Father was not a threat to human life, there is ample support in the record for the trial court's tempering of its findings in that regard. But, although the court's written, final findings were not as severe as its verbal, preliminary findings, the sanction remained the same. We respectfully conclude that, when viewed in light of the Amended Findings and Conclusions and the cited discovery rules, a $20,000 sanction is an unjust and inappropriate punishment for this single discovery violation which opposing counsel cured during trial at a cost of about $1,000.

Hirschfeld's violation was certainly serious enough to warrant a sanction harsher than the attorney's fees it cost Mother to cure: additional punishment of Hirschfeld was warranted to stress the importance of counsel's candor to the court, his compliance with the discovery rules, and his responsibility to consider the best interests of the child. The possible range of just and appropriate sanctions is quite broad in this case. We will not presume to state our own views on what

sanction is just and appropriate to impose on Hirschfeld based on the Amended Findings and Conclusions and the cited discovery rules: We do not decide the sanction; we review the trial court's decision. After conducting that review, we respectfully conclude that a $20,000 sanction so far exceeds what is just and appropriate for the cited violation that it is a clear abuse of trial court discretion.

The sanction, which included an order that Hirschfeld pay all of Mother's attorney's fees, mooted Mother's request that Father pay those fees. That request may no longer be moot and may be considered on remand, in the exercise of trial court discretion.

Mother has requested an award of attorney's fees on appeal. A.R.S. section 25–324 (Supp.1996) requires consideration of "the financial resources of both parties." We will decide the issue after receiving financial affidavits from both parties. Father's failure to file a financial affidavit is his consent to an award of reasonable attorney's fees to Mother. As Father will be the one ordered to pay any such fees, Mother's application should not include fees related to Hirschfeld's *pro se* appeal. Mother is awarded her taxable costs on appeal.

The decree of dissolution is affirmed, the sanctions judgment is vacated and the matter is remanded for further proceedings.

GERBER and GARBARINO, JJ., concur.