995 P.2d 721

**Gilbert TAEGER and Mary Taeger, individually and as parents and guardians of Melissa Joy Taeger, and Melissa Joy Taeger, a minor child, Plaintiffs–Appellants,**

v.

**CATHOLIC FAMILY AND COMMUNITY SERVICES, Roman Catholic Diocese of Phoenix, an Arizona non-profit corporation, d/b/a Catholic Social Service Adoptions and Catholic Social Service of Phoenix; The Roman Catholic Diocese of Phoenix, Defendants–Appellees.**

**No. 1 CA–CV 97–0536.**

Court of Appeals of Arizona, Division 1, Department A.

June 17, 1999.

Review Denied March 14, 2000.*

ter.

Thayer & Thayer, P.C. by Ted J. Thayer, Teresa S. Thayer, Phoenix, Attorneys for Appellants.

Jennings, Strouss & Salmon, P.L.C. by Ernest Calderon, James M. Ackerman, David B. Earl, Phoenix, Attorneys for Appellee—Catholic Family and Community Services.

Snell & Wilmer by Barry D. Halpern, Martha E. Gibbs, Phoenix, Attorneys for Appellee—Roman Catholic Diocese of Phoenix.

## OPINION

GRANT, Judge.

¶ 1 The Taeger family appeals a judgment in favor of Catholic Family and Community Services ("CFCS") and the Roman Catholic Diocese of Phoenix ("the Diocese"). We are asked to determine whether the Taegers failed to establish an agency or alter ego relationship between CFCS[1] and the Diocese as well as to resolve other issues raised by the Taegers related to their adoption of Melissa from CFCS.

¶ 2 Gilbert and Mary Taeger and their adoptive daughter, Melissa, ("the Taegers")[2] filed an action against CFCS and the Diocese for failing to provide them with all non-identifying information about Melissa's biological mother when the Taegers adopted Melissa in 1976 and again when the Taegers specifically requested such information in 1982. The Taegers claim that, had they known certain information about Melissa's biological mother, they would not have agreed to adopt her and Melissa would have received more appropriate and prompt treatment for her mental and physical health problems. The Taegers also named the Diocese as a defendant, alleging that the Diocese was vicariously liable for the acts of CFCS. Judgment was entered in favor of CFCS and the Diocese.

¶ 3 The Taegers appeal the trial court's finding that the Diocese did not violate its disclosure obligations, the finding that no confidential or fiduciary relationship existed between CFCS and the Taegers, the directing of a verdict in favor of the Diocese on the Taegers' vicarious liability theory, the exclusion of certain evidence, and the failure to strike a juror for cause. The essence of this dispute is whether the trial court correctly limited the Taegers to theories of negligence, negligent representation, and fraud, and whether it committed reversible error by denying the Taegers the opportunity to have the jury decide their claim of constructive fraud based on a breach of fiduciary duty. We conclude that a new trial is required because the Taegers presented sufficient evidence of a confidential or fiduciary relationship between themselves and CFCS to withstand a directed verdict and to allow a jury instruction on constructive fraud based on the breach of fiduciary duty claim.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 4 CFCS is a non-profit corporation that administers ten service agencies throughout central and northern Arizona, including an adoption agency. Gilbert and Mary Taeger worked with CFCS to finalize the adoption of their first child. Gilbert and Mary again went through CFCS to adopt their second child, Melissa. They requested a child that was not at high risk for health problems. When Melissa was ready to be placed, Louise Gordon, a CFCS employee, gave Gilbert and Mary basic non-identifying information about the biological mother, which indicated she was healthy other than asthma and an allergy to dust. Melissa developed much more slowly than normal in terms of crawling, walking, and talking. However, Melissa's pediatrician advised the Taegers that some children are just slower than others, and they should not be alarmed. Once Melissa began school, however, her teacher noticed learning problems. The school psychologist then asked Gilbert and Mary to see if there was any more information about Melissa's biological parents that would assist in understanding Melissa's problems. CFCS told the Taegers it needed a court order to release any further information. In 1982, Gilbert and Mary wrote a letter to the Presiding Judge of the Juvenile Court in Maricopa County requesting additional information on the biological mother's health during pregnancy, any problems with the birth, and Melissa's health in her first six weeks of life. The Presiding Juvenile Judge, the Honorable C. Kimball Rose, explicitly ordered CFCS to

---

1. CFCS is currently known as Catholic Social Services of Central and Northern Arizona, Inc. Its name was changed from CFCS in 1994. We use "CFCS" because that was the organization's name at the time of the acts alleged here.

2. "The Taegers" refers to Gilbert, Mary, and Melissa Taeger. First names will be used to specify the party to whom we are referring when referring to only Gilbert, Mary, or Melissa.

provide the Taegers with non-identifying medical and social background information on Melissa's biological parents. In response to the Taegers' inquiry and the court order, CFCS told the Taegers incorrectly there was nothing more in the file even though there was additional information. When CFCS withheld information from the Taegers in 1982, it did not tell them it was doing so and it did so in violation of the court order.

¶ 5 Finally, in 1992, Mary Taeger called CFCS to ask it to review the file again. This time, CFCS told the Taegers that the biological mother had undergone psychiatric care and used tranquilizers during pregnancy, and that the biological mother's siblings had suffered from depression. It is undisputed that this information had been in CFCS's file since 1976. CFCS explained that its policy was not to provide information that might stigmatize the child.

¶ 6 Gilbert and Mary testified that if they had known this information in 1976 when they agreed to adopt Melissa, they would have declined the placement because of the high risk that Melissa would have special needs. However, Gilbert and Mary also testified that none of Melissa's doctors ever said that had they had this information in 1976, they could have predicted Melissa's problems.

¶ 7 The Taegers filed an action against CFCS and the Diocese claiming that CFCS was liable for fraud, negligent misrepresentation, breach of contract, constructive fraud based on breach of fiduciary duty and negligence, and seeking punitive damages. The Taegers also claimed that CFCS was the agent or alter ego of the Diocese and, therefore, the Diocese was vicariously liable for CFCS's actions.

¶ 8 Prior to trial, the court granted summary judgment in favor of CFCS on the punitive damages claim. At the close of the Taegers' case-in-chief, the Diocese and CFCS moved for a directed verdict. The trial court directed a verdict in favor of the Diocese on the vicarious liability claim and directed a verdict in favor of CFCS on the breach of contract and constructive fraud based on breach of fiduciary duty claims. The jury returned a verdict in favor of CFCS

on the remaining negligent misrepresentation, fraud, and negligence claims. The Taegers timely appeal.

## ISSUES

I. Did the Taegers have a confidential or fiduciary relationship with CFCS, entitling them to a jury instruction on constructive fraud and entitling them to have the jury consider their constructive fraud based on the breach of fiduciary duty claim against CFCS?

II. Did the Diocese violate Rule 26.1, Arizona Rules of Civil Procedure, in discovery matters?

III. Did the trial court abuse its discretion in excluding certain evidence?

IV. Did the trial court err by directing a verdict in favor of the Diocese?

## DISCUSSION

### I. Confidential or Fiduciary Relationship

■ ¶ 9 The Taegers argue that they had a confidential or fiduciary relationship with CFCS and, therefore, were entitled to a jury instruction on constructive fraud and to have the jury consider their breach of fiduciary duty claim against CFCS. The trial court found that no such relationship existed, refused the instruction on constructive fraud, and directed a verdict in favor of CFCS on the breach of fiduciary duty claim. "Constructive fraud is defined as a breach of a legal or equitable duty which, without regard to moral guilt or intent of the person charged, the law declares fraudulent because the breach tends to deceive others, violates public or private confidences, or injures public interests." *Lasley v. Helms*, 179 Ariz. 589, 591, 880 P.2d 1135, 1137 (App.1994) (citations omitted). Constructive fraud in this context means that a negligent omission of a regulatory requirement or noncompliance with a regulation causes prejudice to persons whom the regulation was intended to protect, in this case the adoptive parents. *See Tyler v. Children's Home Soc'y of Cal.*, 29 Cal. App.4th 511, 527, 35 Cal.Rptr.2d 291, 299 (Cal.App.1994), *cert. denied*, 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995).

¶ 10 "In determining whether a jury instruction is justified, we must view the evidence in the strongest manner supporting the theory of the party requesting the instruction. If there is any evidence tending to establish such a theory, the instruction should be given even if contradictory facts are also presented." *Pioneer Roofing Co. v. Mardian Constr. Co.*, 152 Ariz. 455, 462, 733 P.2d 652, 659 (App.1986); *see also Cotterhill v. Bafile*, 177 Ariz. 76, 79, 865 P.2d 120, 123 (App.1993) (citation omitted). "Upon review of a motion for directed verdict ..., the appellate court must take that view of the evidence most favorable to the verdict and from that evidence and the inferences reasonably and justifiably to be drawn therefrom, determine whether, under the law, the verdict can be sustained." *Pioneer Roofing*, 152 Ariz. at 462, 733 P.2d at 659.

¶ 11 A fiduciary relationship has been described as " 'something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise.' " *In re McDonnell's Estate*, 65 Ariz. 248, 252–53, 179 P.2d 238, 241 (1947) (quoting 37 C.J.S. Fraud, § 2(2), pp. 213–14). The *McDonnell* court defined a confidential relationship as follows:

> * * * a confidential relation * * * is a relation of parties in which one is bound to act for the benefit of the other and can take no advantage to himself from his acts relating to the interest of the other * * * it is denied that * * * mere confidence or implicit faith in another's honesty and integrity is sufficient to constitute a fiduciary or confidential relationship. So too, mere friendly relations are insufficient for this purpose.

*Id.* at 253, 179 P.2d at 241 (quoting 37 C.J.S. Fraud, § 2(2), pp. 213–14). The Arizona Supreme Court further elaborated on confidential and fiduciary relationships in *Condos v. Felder*, 92 Ariz. 366, 377 P.2d 305 (1962):

> There is no uniform practice among the courts in their use of the phrases "fiduciary relation" and "confidential relation." In many decisions the words are used as synonyms. In most cases, however, the latter phrase * * * [does] not [fall] into any well-

defined category of the law. The relations of trustee and cestui, executor or administrator and creditors, next of kin or legatees, guardian and ward, principal and agent, attorney and client, corporate director and corporation, and the like are easily thrown into distinct subdivisions of the law. They have distinctive names. The term "fiduciary" might well be reserved for such relations.

> But there are other cases where there is just as great intimacy, disclosure of secrets, intrusting of power, and superiority of position in the case of the representative, but where the law has no special designation for the position of the parties. It cannot be called trust or executorship, and yet it is so similar in its creation and operation that it should have like results.

*Id.* at 371, 377 P.2d at 308 (quoting 3 *Bogert on Trusts and Trustees*, Pt. 1, § 482 (1946)). *In re Guardianship of Chandos*, 18 Ariz.App. 583, 585, 504 P.2d 524, 526 (1972) (quoting 15A C.J.S. Confidential, p. 352), offered another definition of confidential relationship as one arising

> by reason of kinship between the parties, or professional, business, or social relations that would reasonably lead an ordinarily prudent person in the management of his business affairs to repose that degree of confidence in another which largely results in the substitution of that other's will for his in the material matters involved in the transaction; or where the parties occupy relations, whether legal, natural, or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists.

¶ 12 Whether a confidential relationship exists is a question of fact. *Rhoads v. Harvey Publications, Inc.*, 145 Ariz. 142, 148, 700 P.2d 840, 846 (App.1984). However, "[w]hen the evidence is insufficient to support a verdict, the trial court has a duty to decide the issue [as a matter of law]." *Id.* (citations omitted). In refusing to give the jury instruction on constructive fraud and directing a verdict for CFCS on the breach of fiduciary duty claim, the trial court determined as a matter of law that no confidential or fiduciary relationship existed. We hold

that the evidence created a question of fact as to the existence of such a relationship and, therefore, that question should have gone to the jury. The jury should have been instructed on fiduciary relationships and on the elements of constructive fraud.

¶ 13 The Taegers presented evidence that Gilbert and Mary trusted the employees of CFCS and believed that CFCS would give them all the information necessary for the Taegers to provide Melissa adequate care and to succeed as adoptive parents. Indeed, CFCS had a policy of giving adoptive parents all non-identifying information about the biological parents. CFCS also admitted that it worked as "a partnership" with the adoptive parents in the best interests of the child.

¶ 14 The relationship between adoptive parents and the agency from which they are accepting a child is, by its very nature, a relationship that would reasonably lead the adoptive parents to place a great degree of trust in the agency. The agency's will is necessarily substituted for that of the parents with regard to the decision as to what background information is relevant and should be disclosed to the adoptive parents. The adoptive parents, not having access to that information, cannot make a choice as to what information is disclosed. Only the agency has the ability to disclose or withhold information. Thus, the agency is in a superior position, and the adoptive parents must necessarily rely on the agency to act in the adoptive child's best interests in providing the information. The agency cannot hide information or be dishonest.

¶ 15 "In a fiduciary relationship, the fiduciary holds 'superiority of position' over the beneficiary." *Standard Chartered PLC v. Price Waterhouse,* 190 Ariz. 6, 24, 945 P.2d 317, 335 (App.1996) (quoting *Rhoads,* 145 Ariz. at 149, 700 P.2d at 847). In *Standard Chartered,* this court stated:

Our case law distinguishes a fiduciary relationship from an arm's length relationship. *See, e.g., Brazee v. Morris,* 68 Ariz. 224, 228–29, 204 P.2d 475, 477–78 (1949); *Rhoads v. Harvey Pubs., Inc.,* 145 Ariz. 142, 148–49, 700 P.2d 840, 846–47 (App. 1984). Mere trust in another's competence

or integrity does not suffice; "peculiar reliance in the trustworthiness of another" is required. *Stewart v. Phoenix Nat'l Bank,* 49 Ariz. 34, 44, 64 P.2d 101, 106 (1937); *Rhoads,* 145 Ariz. at 148–49, 700 P.2d at 846–47. A fiduciary relationship is a confidential relationship whose attributes include "great intimacy, disclosure of secrets, [or] intrusting of power." *Rhoads,* 145 Ariz. at 149, 700 P.2d at 847 (quoting *Condos v. Felder,* 92 Ariz. 366, 371, 377 P.2d 305, 308 (1962)). In a fiduciary relationship, the fiduciary holds "superiority of position" over the beneficiary. *Id.* This superiority of position may be demonstrated in material aspects of the transaction at issue by a "substitution of [the fiduciary's] will." *Herz & Lewis, Inc. v. Union Bank,* 22 Ariz.App. 437, 439, 528 P.2d 188, 190 (1974) (quoting *In re Guardianship of Chandos,* 18 Ariz.App. 583, 585, 504 P.2d 524, 526 (1972)).

Although the existence of a fiduciary duty is generally a question of fact, "[w]hen the evidence is insufficient to support a verdict, the trial court has a duty to decide the issue." *See Gemstar Ltd. v. Ernst & Young,* 185 Ariz. 493, 504–05, 917 P.2d 222, 233–34 (1996) (quoting *Rhoads,* 145 Ariz. at 148, 700 P.2d at 846). [Footnote omitted.] We find the evidence insufficient to support a verdict in this case.

\* \* \*

Nor is a fiduciary relationship established by Union's deference to PW's superior knowledge of United's financial statements and records. Such reliance does not establish a fiduciary relationship *unless the knowledge is of a kind beyond the fair and reasonable reach of the alleged beneficiary and inaccessible to the alleged beneficiary through the exercise of reasonable diligence. Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235, 1242 (1982) (citing *Wolf v. Brungardt,* 215 Kan. 272, 524 P.2d 726 (1974)).

190 Ariz. at 24–25, 945 P.2d at 335–36 (emphasis added).

¶ 16 Unlike the parties in *Standard Chartered,* Gilbert and Mary did not merely defer to CFCS's superior knowledge of the biologi-

cal mother's background information. CFCS's knowledge of the biological mother's background information was "beyond the fair and reasonable reach of [Gilbert and Mary] and inaccessible to [Gilbert and Mary] through the exercise of reasonable diligence." *Id.* at 25, 945 P.2d at 336. Gilbert and Mary had no other source for this information and, thus, had to rely on CFCS to provide them with all of the appropriate information.

¶ 17 CFCS argues that a fiduciary relationship cannot exist because Gilbert and Mary *unilaterally* placed trust in CFCS and provided them with confidential personal information. To the contrary, CFCS voluntarily entered this position of trust by accepting the responsibility of gathering information on prospective adoptive parents and biological parents and matching children and adoptive parents. CFCS knowingly became the sole source of information about the child's background and led the adoptive parents to believe that it would provide all non-identifying background information.

¶ 18 Given CFCS's superior position and exclusive access to the biological mother's background information, Gilbert and Mary's confidence in CFCS was "naturally inspired," and, could be found to have reasonably existed. *See Chandos,* 18 Ariz.App. at 585, 504 P.2d at 526 (quoting 15A C.J.S. Confidential, p. 352). This is not "mere trust in another's competence or integrity." *See Standard Chartered,* 190 Ariz. at 24, 945 P.2d at 335. The confidential and fiduciary nature of the relationship between adoptive parents and an adoption agency was described by one commentator as follows:

> An adoption is not an arms-length sale of widgets. Although the primary purpose of adoption is to promote the well-being of children, adoptive parents are also in a special relationship with an adoption intermediary. Professional guidelines for adoption agencies recognize that "child welfare agencies have a responsibility to provide preparation, counseling and support on an ongoing basis for all the parties involved in an adoption," and that the services provided by an adoption agency should include protection of the interests of adoptive parents, including their interest in making "a

free and informed decision to adopt." The counseling services an adoption agency provides to adoptive parents further illustrate the fiduciary nature of the relationship. As an outcome of this counseling relationship, it is natural that adoptive parents would place special trust in agency social workers with whom they have worked closely and discussed intimate details of their lives.

D. Marianne Brower Blair, *Getting the Whole Truth and Nothing But the Truth: The Limits of Liability For Wrongful Adoption,* 67 Notre Dame L.Rev. 851, 908 (1992) (footnotes omitted).

¶ 19 CFCS voluntarily acted on Melissa's behalf when it accepted her from her biological mother, asked a court to terminate her biological parents' rights, and investigated and placed her with Gilbert and Mary. CFCS owed a duty to Melissa separate from its duty to the Taegers when CFCS took Melissa from her biological mother with the implied or express promise that it would care for Melissa and place her in an advantageous adoptive family. Matching Melissa with appropriate adoptive parents meant CFCS could be found to have assumed the duty of providing the prospective parents with any and all relevant information about Melissa.

■ ¶ 20 In 1982, the Taegers again had to rely on CFCS's exclusive access to the requested information and the trust inherent in CFCS's position as the adoption agency that gathered, controlled, and disseminated such information. CFCS argues that a fiduciary relationship does not exist here because a fiduciary cannot serve more than one master. *See Ornamental & Structural Steel, Inc. v. BBG, Inc.,* 20 Ariz.App. 16, 19, 509 P.2d 1053, 1056 (1973). CFCS represented the adoptive parents, the child, and the biological mother. The fact that CFCS represented more than one party in the adoption process does not preclude a finding of a fiduciary relationship as to the adoptive parents or the child. Gilbert and Mary were aware that CFCS was working with the biological mother. By providing information about themselves and seeking to adopt a child from CFCS, Gilbert and Mary consented to CFCS's representation of the other

parties to the adoption. The biological mother also knew that CFCS was working with potential adoptive families. Thus, the parties were aware of, and consented to, CFCS's multiple representation. *See Marmis v. Solot Co.*, 117 Ariz. 499, 573 P.2d 899 (App. 1977).

¶ 21 In providing all parties with full disclosure, the fiduciary meets its obligation to act with the utmost loyalty and integrity. *Id.* at 502, 573 P.2d at 902 ("The undertaking of such a dual representation of conflicting interests, without the knowledge or approval of the competing principals, would, of course, not be countenanced."); *see also Warren v. Mangels Realty*, 23 Ariz.App. 318, 321, 533 P.2d 78, 81 (1975) (holding that broker who represents seller cannot represent buyer in purchase of property from seller without seller's knowledge and consent). In *Ornamental*, however, the court found the broker violated his fiduciary duty by failing to disclose his dual representation, thereby obtaining information he otherwise might not have been able to obtain. 20 Ariz.App. at 19–20, 509 P.2d at 1056–57. Thus, we do not find that *Ornamental* conflicts with our holding.

¶ 22 Both parties cite *Tyler v. Children's Home Society of California* in support of their positions. In *Tyler*, the biological parents sought to rescind an agreement relinquishing their rights to their child who was placed for adoption by Children's Home Society of California. 35 Cal.Rptr.2d at 295. One of the bases the parents urged for rescission was constructive fraud by the adoption agency. *Id.* at 312–13. The California court held that "an adoption agency's concurrent responsibilities to the other parties, the child and prospective adoptive parents, whose interests may potentially conflict with the birth parents, negates a fiduciary relationship with the birth parents." *Id.* at 313. The court then assumed without analysis that a confidential relationship existed. *Id.* However, in *Tyler*, because the biological parents failed to show that they were prejudiced by the agency's conduct, rescission was denied.

¶ 23 In *M.H. v. Caritas Family Servs.*, 475 N.W.2d 94, 99 (Minn.App.1991), *aff'd in part, rev'd in part*, 488 N.W.2d 282 (Minn.1992), the court noted that "[n]ondisclosure of material facts may constitute a misrepresentation where the parties are in a confidential or fiduciary relationship, or where one party has special knowledge of material facts to which the other party does not have access." (Citation omitted). The court noted that such circumstances were present without stating which particular circumstance it found existed.

¶ 24 We conclude that an agency's concurrent representation of adoptive parents, the child, and biological parents does not preclude a fiduciary relationship with any of these persons. The court in *Tyler* cited Restatement (Second) of Agency, section 13, comment a, in support of its holding that such concurrent responsibilities negated a fiduciary relationship. However, comment a to the Restatement (Second) of Agency, section 13, states that an agent has a duty not to act on behalf of an adverse party *without the principal's consent.* Thus, when the principal has knowledge of and consents to the concurrent representation, the existence of a fiduciary relationship cannot be ruled out as a matter of law.

¶ 25 Finally, CFCS argues that public policy reasons weigh against finding a fiduciary or confidential relationship in these circumstances. We disagree. Allowing a constructive fraud claim does not impose liability without fault. The existence of a confidential or fiduciary relationship simply means that upon a finding that CFCS made false or misleading statements, the burden shifts to CFCS to prove that it acted with entire fairness. Thus, CFCS would be liable only if it made false or misleading statements *and* did not act with entire fairness.

¶ 26 Similarly, we reject CFCS's claim that finding such a relationship intrudes too far into the adoptive process and renders adoption agencies guarantors of the health of adopted children. A fiduciary duty imposes on adoption agencies only the duty to use the utmost fairness and honesty in its dealings with adoptive parents and the children it places for adoption. Such a result does not offend public policy; rather, it supports the public policy that the most suitable placements be made.

¶ 27 We conclude that the evidence created a question of fact as to the existence of a confidential relationship or fiduciary duty. When a confidential relationship exists, "so that one [party] places peculiar reliance in the trustworthiness of another, the latter is under a duty to make a full and truthful disclosure of all material facts and is liable for misrepresentation or concealment. The breach of this duty gives rise to an action in constructive fraud." *Rhoads v. Harvey Publications, Inc.*, 145 Ariz. at 148–49, 700 P.2d at 846–47. The Taegers were entitled to a jury instruction on constructive fraud as that theory was not fully covered by any other instruction. *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 144 Ariz. 6, 10, 695 P.2d 255, 259 (1985). There are elements required for a finding of constructive fraud that are not required for negligence, negligent misrepresentation, or fraud, the Taegers' other causes of action. In order to establish a claim for constructive fraud, one must prove the existence of a legal or equitable duty the breach of which, regardless of the intent of the party charged, the law declares fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. *Rhoads*, 145 Ariz. at 148, 700 P.2d at 846.

¶ 28 To prove common law fraud, nine elements must be established: (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (6) the hearer's ignorance of the information's falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury. *Burkons v. Ticor Title Ins. Co. of Cal.*, 165 Ariz. 299, 308, 798 P.2d 1308, 1317 (App.1989).

¶ 29 To prove negligence, one must establish: (1) duty, (2) breach of that duty, (3) causation, and (4) damages. *Ocotillo West v. Superior Court*, 173 Ariz. 486, 488, 844 P.2d 653, 655 (App.1992). To prove neg-

ligent misrepresentation, the Taegers must establish that (1) CFCS, in the course of business, gave incorrect information for the guidance of others in their business transactions; (2) CFCS intended, or could reasonably foresee, that the Taegers would rely on that information; (3) CFCS failed to exercise reasonable care in obtaining or communicating that information; (4) the Taegers relied on that incorrect information; (5) the Taegers' reliance was justified; and (6) the Taegers' reliance was a cause of their damages. *See Standard Chartered*, 190 Ariz. at 31, 945 P.2d at 342.

¶ 30 The trial court's failure to instruct the jury on constructive fraud prejudiced the Taegers because the elements of constructive fraud are not redundant to the elements of the other counts including negligence, negligent misrepresentation, and fraud. Thus a jury might have found the elements of negligence, negligent misrepresentation, and fraud not proved and yet found the elements of constructive fraud proved. If so, the Taegers would have been prejudiced by the inability to seek a verdict on constructive fraud. Additionally, the trial court erred in directing a verdict on the breach of fiduciary duty claim. Accordingly, we reverse and remand for a new trial on the Taegers' claim of constructive fraud based on alleged breach of fiduciary duty by CFCS.

## II. Rule 26.1 Violation By The Diocese

¶ 31 The basis of the Taegers' claims against the Diocese was that CFCS was the alter-ego of the Diocese and, therefore, the Diocese was vicariously liable for the acts of CFCS. The Taegers and the Diocese disputed the Diocese's obligation to disclose documents regarding the relationship between CFCS and the Diocese. The Diocese apparently never disclosed any such documents. The Taegers filed a motion for sanctions, arguing that the Diocese failed or refused to provide or identify documents relevant to the relationship between the Diocese and CFCS either under Rule 26.1, Arizona Rules of Civil Procedure, or in response to a specific discovery request.[3]

3. Hereinafter, Rule ___ will refer to Arizona Rules of Civil Procedure.

¶ 32 The Diocese asserted that any documents demonstrating the Diocese's control over CFCS would be in CFCS's records, not the Diocese's records. The Diocese also objected to the request for production on the grounds that the documents were protected by the First Amendment, but did not describe the documents it claimed were protected as required. *See* Rule 26.1(f). The Diocese claimed that because the Taegers had not filed a Motion to Compel, sanctions under Rule 37(b)(2)(A) and (B) were inappropriate as no violation of a court order occurred. Finally, the Diocese argued that even if a violation occurred, the Taegers were not prejudiced by its nondisclosure because CFCS had produced the documents.

¶ 33 The trial court denied the motion, finding no nondisclosure that would warrant the sanction of "essentially, declaring a legal issue in either side's favor." The issue of the Diocese's alleged disclosure violations came up again during trial.[4] The trial court told the Taegers' counsel to provide evidence that the Taegers had requested, and the Diocese had refused to disclose, specific financial records.[5] As to the Taegers' argument that the Diocese was obligated by Rule 26.1 to identify or produce documents related to the control issue, the trial court stated:

> I would expect that the undercapitalization of CFCS could be shown by the corporation's own financial records. The Dio-

cese interposed an objection to giving you financial records of the Diocese based on various objections she stated on the record here today.

You, over the course of the litigation, did not bring any of those objections into this courtroom and ask for relief. So I would draw the conclusion she had every right to rely on the fact that you had acceded to the objections made in her discovery statements.

¶ 34 We are limited by our standard of review. We will not reverse the trial court's decision on the motion for sanctions absent an abuse of discretion. *Taliaferro v. Taliaferro,* 188 Ariz. 333, 339, 935 P.2d 911, 917 (App.1996) (citing *Standage v. Jaburg & Wilk,* 177 Ariz. 221, 229, 866 P.2d 889, 897 (App.1993), and *James, Cooke & Hobson, Inc. v. Lake Havasu Plumbing & Fire Protection,* 177 Ariz. 316, 319, 868 P.2d 329, 332 (App.1993)). On the facts of this case, we do not find that the trial court abused its discretion in denying sanctions.

### III. Exclusion of Evidence

■ ¶ 35 The Taegers argue that the trial court abused its discretion in excluding exhibits 41, 42, 44, 47, 54, 55, and 74. We will affirm the trial court's rulings on the exclusion or admission of evidence absent (1) an abuse of discretion, or (2) legal error and

---

4. At the time of trial, Rules 26.1(c) and (g) were still in effect. Those subsections have since been deleted, *see* Rule 26.1 (1996), and sanctions for disclosure violations are now set forth in amended Rule 37(c) (1997). At the time of trial, Rule 26.1 provided, in relevant part as follows:

> (c) In addition to any other sanction the court may impose, the court shall exclude at trial any evidence offered by a party that was not timely disclosed as required by this rule, except by leave of court for good cause shown....
> (g) If a party or attorney fails to comply with the provisions of this rule, the court upon motion of a party or on the court's own motion shall make such orders with regard to such conduct as are just, including any of the orders provided in Rule 16(f).

Rule 16(f) (1996) authorized the court to make such orders as are just, including those orders provided in Rule 37(b)(2)(B), (C), or (D). Rule 37(b)(2)(B), (C), and (D) (1996) authorized orders as follows:

> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;
> (C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
> (D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination.

5. In 1996, Rule 26.1(f) required the Diocese to expressly indicate that it was withholding information on the basis of privilege and to describe the nature of the documents being withheld so that the Taegers could contest the claim. We do not have the disclosure statements before us, but from the arguments presented, we assume that this requirement was not met.

prejudice. *Gasiorowski v. Hose,* 182 Ariz. 376, 382, 897 P.2d 678, 684 (App.1994).

¶ 36 The Diocese contends that the Taegers have abandoned this issue by failing to specify the errors and to cite appropriate legal authority. *See Modular Systems, Inc. v. Naisbitt,* 114 Ariz. 582, 587, 562 P.2d 1080, 1085 (App.1977). Although the Taegers' arguments could be more specific, the Taegers cite to portions of the transcript in which the parties objected and the trial court made its rulings. Accordingly, we conclude the Taegers have sufficiently presented this issue on appeal for us to review it.

¶ 37 Exhibits 41, 42, 44, and 74 are minutes of various CFCS board of directors meetings. The trial court excluded these minutes as hearsay. However, the first pages of exhibits 41, 44, and 74 were admitted into evidence as 41A, 44A, and 74A. The Taegers argued that the minutes fell under the business records hearsay exception and were admissions of CFCS, a party opponent. *See* Ariz. R. Evid. 801(d)(2), 803(6). Exhibit 42 included a statement by Robert Pecharich ("Pecharich"), a board member, that Sister Sybil, the CFCS director, said that the CFCS articles of incorporation should be amended to prevent a potential claim that the Diocese is liable for the acts' of CFCS. The Taegers argued that this statement was an admission by a party opponent and fell outside the hearsay rule. *See* Ariz. R. Evid. 801(d)(2).

 ¶ 38 Under Rule 803(6), Arizona Rules of Evidence, the Taegers must establish that the statements contained within the minutes of the CFCS board meetings are business records and are not hearsay. *See* Ariz. R. Evid. 805.[6] We need not decide whether these statements are admissions by party opponents because we do not find any prejudice to the Taegers. The Taegers' expert, LeRoy Gaintner ("Gaintner"), testified that one of the bases for his opinion was that CFCS amended its articles of incorporation because it was concerned about the need to limit the Diocese's exposure to liability for the acts of CFCS. Additionally, Paul Martodam ("Martodam"), the current director of CFCS, testified that the board amended CFCS's articles of incorporation to make clear that liability for CFCS's acts could not run to the Diocese. Finally, the Diocese's attorney, Gregory J. Leisse ("Leisse"), testified that Pecharich wanted to amend CFCS's articles of incorporation to eliminate any potential claim that the Diocese was liable for CFCS's acts. Thus, the Taegers were able to introduce the pertinent portions of exhibit 42 through testimony despite the court's exclusion of the actual exhibit. Accordingly, there was no prejudice as to the exclusion of exhibit 42. As to exhibits 41, 44, and 74, no offer of proof was made as to the statements that the Taegers claim should have been admitted. Thus, we find no abuse of discretion in excluding these exhibits.

¶ 39 Exhibit 47 is the combined financial statement of the Diocese as of June 30, 1988 and 1987 (with Auditor's Report). The trial court ruled that the Taegers did not establish the proper foundation for this exhibit. The Taegers argued that foundation was established when Martodam, the CFCS custodian of records and CEO, testified that the financial statement was contained in CFCS's records and when Gaintner testified that he obtained the financial statement from documents CFCS produced.

 ¶ 40 The Taegers also argued that exhibit 47 was a business record and not hearsay under Rule 801, Arizona Rules of Evidence. Nonetheless, the Taegers still had to provide foundation for exhibit 47. *See* Rule 901(a), Ariz. R. Evid. (requirement of authentication or identification is a condition precedent to admissibility); *State v. Lavers,* 168 Ariz. 376, 386, 814 P.2d 333, 343, *cert. denied,* 502 U.S. 926, 112 S.Ct. 343, 116 L.Ed.2d 282 (1991). "The trial judge must be satisfied that the record contains sufficient evidence to support a jury finding that the offered evidence is what its proponent claims it to be." *Id.* The trial court's decision will be upheld absent an abuse of discretion. *Id.* (citations omitted).

---

**6.** Rule 805, Arizona Rules of Evidence, provides: "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

¶ 41 Contrary to the Taegers' claims, Martodam testified that he had never seen exhibit 47 before and was not aware that it was in the CFCS files. Thus, the only foundation for exhibit 47 was from the Taegers' expert, Gaintner, who said he obtained the document from a box of records from CFCS. The Taegers argue that this is sufficient evidence to establish foundation. The Taegers' reliance on *State v. Riggs,* 186 Ariz. 573, 575–76, 925 P.2d 714, 716–17 (App.1996), *vacated on other grounds,* 189 Ariz. 327, 942 P.2d 1159 (1997), and *State v. Petzoldt,* 172 Ariz. 272, 275, 836 P.2d 982, 985 (App.1991), in support of this argument is misplaced. The courts in *Riggs* and *Petzoldt* both cite *Saks Int'l Inc. v. M/V "Export Champion",* 817 F.2d 1011, 1013 (2d Cir.1987), which held that documents may be admitted when foundation is laid by a witness who is not an employee of the entity that prepared them. *Riggs,* 186 Ariz. at 575–76, 925 P.2d at 716–17; *Petzoldt,* 172 Ariz. at 275, 836 P.2d at 985. However, in *Riggs* and *Petzoldt,* the witness who laid foundation was able to testify that the documents were kept in the regular course of business. *Riggs,* 186 Ariz. at 575, 925 P.2d at 716; *Petzoldt,* 172 Ariz. at 275, 836 P.2d at 985. Such testimony is lacking here. Accordingly, we find no abuse of discretion in excluding exhibit 47 for lack of foundation.

¶ 42 Exhibit 54 is the minutes of the CFCS Executive Committee meeting in January 1983. Apparently, exhibit 54 addresses the Bishop's approval of a salary increase for Sister Sybil. The trial court sustained foundation and hearsay objections. We find no foundation for this document anywhere in the record. Accordingly, it was properly excluded.

¶ 43 Exhibit 55 is a letter written on CFCS letterhead from Martin, a former Diocesan Director of CFCS, tendering his resignation effective December 31, 1991. The Taegers argued that it was a business record and an admission of CFCS, a party opponent. The trial court sustained the foundational, hearsay, and Rule 403 objections. *See* Ariz. R. Evid. 403. The foundational objection was properly sustained. The Taegers established only that CFCS produced the document in the course of this litigation. Absent some evidence that this document is what its proponent claims it to be, the trial court properly excluded exhibit 55 for lack of foundation. *See Lavers,* 168 Ariz. at 386, 814 P.2d at 343.

**IV. Directed Verdict for the Diocese**

¶ 44 At the close of the Taegers' case-in-chief, the trial court granted the Diocese's motion for a directed verdict, finding the Taegers had failed to establish an agency or alter-ego relationship between CFCS and the Diocese. We review the grant of a directed verdict *de novo* and view the evidence in the light most favorable to the party opposing the motion. *Gemstar Ltd. v. Ernst & Young,* 185 Ariz. 493, 505, 917 P.2d 222, 234 (1996) (citation omitted). "A directed verdict is appropriate if 'the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.'" *Id.* (quoting *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990)).

¶ 45 To hold the Diocese liable on an alter-ego theory, the Taegers must establish both "unity of control" and "that observance of the corporate form would sanction a fraud or promote injustice." *Gatecliff v. Great Republic Life Ins. Co.,* 170 Ariz. 34, 37, 821 P.2d 725, 728 (1991) (citing *Dietel v. Day,* 16 Ariz.App. 206, 208, 492 P.2d 455, 457 (1972)); *see also Cammon Consultants Corp. v. Day,* 181 Ariz. 231, 233, 889 P.2d 24, 26 (App.1994). Unity of control is shown where the parent corporation exercised "substantially total control over the management and activities of" the subsidiary. *Gatecliff,* 170 Ariz. at 37, 821 P.2d at 728. Factors establishing "substantially total control" include:

> stock ownership by the parent; common officers or directors; financing of subsidiary by the parent; payment of salaries and other expenses of subsidiary by the parent; failure of subsidiary to maintain formalities of separate corporate existence; similarity of logo; and plaintiff's lack of knowledge of subsidiary's separate corporate existence.

*Id.* (citation omitted). To be held responsible for actions of its subsidiary, the parent must

actually exercise this control so that the subsidiary becomes "a mere instrumentality." *See Oldenburger v. Del E. Webb Dev. Co.*, 159 Ariz. 129, 134, 765 P.2d 531, 536 (App.1988) (refusing to disregard corporate form where evidence showed that parent corporation had authority to overrule subsidiary's decisions but took no such action).

¶ 46 All of the powers of the Diocese, a corporation sole,[7] rest with the Bishop. The Taegers' evidence consisted largely of its expert witness, Gaintner, who testified that the Diocese had the capacity to control CFCS and exercised that capacity. Gaintner based his opinion on several facts.

¶ 47 First, the Diocese's accountants prepared a combined financial statement of the Diocese and CFCS, from which Gaintner presumed that the accountants must have concluded that there was common control. However, Gaintner admitted that the control standard for filing a combined financial statement was, not the equivalent of the control standard for determining whether one corporation is an alter-ego of another. He also admitted that this type of control did not necessitate control over day-to-day operations, but only indicates an ability to control the board and the policies of CFCS.

¶ 48 In fact, the evidence showed the Bishop did *not* exercise day-to-day control over CFCS or its board of directors. Leisse testified that the Bishop's responsibility regarding CFCS is to ensure that CFCS follows the principles of the Roman Catholic faith. Additionally, Martodam testified that the articles of incorporation did not empower the Bishop to direct him or the employees of CFCS to take any particular action.

¶ 49 Second, Gaintner also based his opinion on CFCS's articles of incorporation, which were amended to shift more control to the board from the Bishop.[8] He also relied on the stated reason for the amendment,

which was to avoid a potential claim that the Diocese was liable for CFCS's acts.

¶ 50 Third, Gaintner relied upon the ownership or title to certain CFCS property. CFCS's real estate contracts and property were held in the Bishop's name and that CFCS's assets were shown on the combined financial statement as unrestricted funds of the Diocese. Gaintner testified that if, in 1979, CFCS did not own the real property to which the Diocese held title, CFCS would have been undercapitalized. However, on cross-examination, Gaintner acknowledged that according to CFCS's 1979 financial statement, although the Diocese held legal title to the real property, CFCS had all other rights of ownership. Also, Martodam testified that, to his knowledge, CFCS has never been unable to meet its expenses.

¶ 51 Fourth, Gaintner found it significant that the CFCS financial statements he examined each had a notation that CFCS was formed "as part of the Roman Catholic Diocese of Phoenix." However, the notation merely established a relationship and not control. Indeed, Gaintner admitted CFCS was a separate legal entity with its own board of directors. The Diocese does not have a board of directors, so there are no common board members with CFCS. After the articles were amended in 1994, however, the Bishop became one of CFCS's directors.

¶ 52 Fifth, there was evidence that CFCS used personnel forms and other personnel services of the Diocese. However, CFCS paid a fee to the Diocese for those services. CFCS received some funds from the Charity and Development Appeal of the Diocese, which helped pay its expenses but, in 1995, CFCS received ninety-two percent of its funds from sources other than the Charity and Development Appeal.

¶ 53 Finally, the Taegers never claimed that they believed they were dealing with the

---

7. A corporation sole is "one consisting of one person only, and his successors in some particular station, who are incorporated by law in order to give them some legal capacities and advantages, particularly that of perpetuity, which in their natural persons they could not have had." *Black's Law Dictionary* 410 (4th ed.1951).

8. For example, the percentage of board members the Bishop could appoint was reduced from one hundred to twenty-five percent; upon dissolution, CFCS's assets no longer went to the Diocese; the board could now adopt and amend bylaws without the Bishop's approval; and sections were added that clearly indicated that the Diocese does not control CFCS.

Diocese or the Bishop. In fact, Gilbert testified that he understood that CFCS was not the Catholic Church. Mary testified that none of the adoption documents referred to the Diocese. The evidence merely established that some relationship between CFCS and the Diocese existed, but not such that CFCS was a "mere instrumentality" of the Diocese. To the extent the Bishop exercised any control over CFCS, it was ecclesiastical in nature and not substantive control over CFCS's business operations.

¶ 54 Our supreme court has held that the second prong of the alter-ego analysis is satisfied if observance of the corporate form would sanction a fraud or promote injustice, if observing the form would allow the corporation to confuse the plaintiffs, frustrate their efforts to protect their rights, and allow the responsible party to evade liability. *Gatecliff,* 170 Ariz. at 38, 821 P.2d at 729. Here, the Taegers admittedly were not confused about the relationship between the Diocese and CFCS. They understood that they were working with CFCS. Given the lack of control the Diocese exercised over CFCS's business operations, CFCS is wholly responsible for its own conduct. Thus, it would not promote an injustice to limit the Taegers to seek recourse only from CFCS.

¶ 55 Based on the evidence presented at this trial, the directed verdict in favor of the Diocese is affirmed.

**V. Remaining Issue on Appeal**

¶ 56 Because we have ordered a new trial as to CFCS, we need not consider whether the trial court erred in failing to strike juror Strong for cause.

**CONCLUSION**

¶ 57 The evidence was sufficient to allow a reasonable juror to conclude that CFCS had a confidential and/or fiduciary relationship with the Taegers. Thus, the Taegers were entitled to have the jury instructed on constructive fraud and the trial court erred in directing a verdict in favor of CFCS on the breach of fiduciary duty claim. This error requires a new trial. The directed verdict in favor of the Diocese is affirmed. The judg-

ment for CFCS is reversed and the case remanded for new trial as to CFCS.

CONCURRING: RUDOLPH J. GERBER, Presiding Judge, and NOEL FIDEL, Judge.