895 P.2d 523

Susan K. GORDON, the surviving spouse of Richard John Gordon, Sr., deceased, on behalf of Sheri Lynne Gordon and Richard John Gordon, Jr., the surviving children of Richard John Gordon, Sr., and Ann Gordon, the surviving parent of Richard John Gordon, Sr.; Susan K. Gordon, as Personal Representative of the Estate of Richard John Gordon, Sr., on behalf of the Estate, Plaintiffs–Appellants,

v.

James LIGUORI, M.D. and Jane Doe Liguori, husband and wife; Lutheran Hospitals and Homes Society of America, a North Dakota corporation, d/b/a/ Mesa Lutheran Hospital; and Does I–XXX, Defendants–Appellees.

No. 1 CA–CV 92–0190.

Court of Appeals of Arizona, Division 1, Department C.

Jan. 24, 1995.

Petition for Review Withdrawn June 7, 1995.

Begam, Lewis, Marks, Wolfe & Dasse, P.C. by Robert H. Kleinschmidt, Kelly J. McDonald, Cora Perez, Phoenix, for appellants.

Teilborg, Sanders & Parks, P.C. by Rick N. Bryson, Neil C. Alden, Phoenix, for appellees Liguori.

Robbins & Green, P.A. by William H. Sandweg, III, Phoenix, for appellee Mesa Lutheran Hosp.

## OPINION

WEISBERG, Acting Presiding Judge.

Plaintiffs appeal the judgment entered following a jury trial, arguing that the trial court erred by excluding certain evidence. Because we conclude that the trial court did not abuse its discretion, we affirm.

## FACTS AND PROCEDURAL HISTORY

On January 2, 1988, Richard Gordon experienced severe chest pain and was admitted to Mesa Lutheran Hospital (the "hospital"). He was placed in the care of Dr. James Liguori, a cardiologist. Dr. Liguori initially believed that Gordon's chest pain was caused by either a heart attack, esophageal spasms, pneumonia, pericarditis, or a dissecting aortic aneurysm. By January 3, Dr. Liguori had determined, based on lab tests and x-rays, that the chest pain was probably associated with either pneumonia or pericarditis.

On January 5, an echocardiogram was performed. Although the results indicated an abnormally large aortic root, that condition was not noted by Dr. Liguori when he first reviewed the echocardiogram on January 6.

On January 7, Dr. Liguori studied the echocardiogram again and concluded that it showed a markedly dilated ascending thoracic aorta, which indicated aortic abnormalities. He therefore ordered a CT scan of Gordon's chest, which was performed at 3:42 p.m. on January 7. On that day, Dr. Neal Junck, a radiologist employed by the hospital, interpreted the CT scan to reflect an abnormality in the aorta without concluding that it was caused by a dissecting aortic aneurysm. Dr. Junck dictated a report of his findings but did not immediately contact Dr. Liguori. The parties dispute whether Dr. Liguori had told Dr. Junck to contact him immediately if the CT scan suggested an aortic abnormality.

After reading Dr. Junck's report the next morning, Dr. Liguori ordered an aortic angiogram which indicated that Gordon had a dissecting aortic aneurysm. Gordon went

into surgery for repair of the aorta at 2:00 p.m. that same day. During anesthetic induction, Gordon's aorta ruptured causing profound circulatory impairment. Although the surgeon successfully repaired the aorta, Gordon was left in a vegetative state and died on January 20.

Gordon's survivors ("plaintiffs") subsequently filed a medical negligence complaint against Dr. Liguori and the hospital. They alleged that an earlier diagnosis of the dissecting aortic aneurysm would have improved Gordon's chances of survival and that Dr. Liguori failed to meet the required standard of care by failing to timely diagnose the condition. As to the hospital, plaintiffs alleged that Dr. Junck failed to promptly communicate the results of the CT scan to Dr. Liguori and that certain nursing employees of the hospital failed to transfer to the radiology department pertinent clinical data that would have alerted Dr. Junck to the urgency of the situation.

Dr. Liguori's discovery response indicated that Gordon's condition was extremely difficult to diagnose, but that he had made a timely diagnosis. The hospital took the position that Dr. Junck did not fall below the relevant standard of care either by failing to recognize the dissection or by failing to immediately notify Dr. Liguori. Both Dr. Liguori and the hospital asserted that an earlier diagnosis would not have affected the outcome because Gordon's aortic rupture was caused by anesthestic induction and, therefore, would have likely occurred even if surgery had been attempted several days earlier.

In response to interrogatories, Dr. Liguori indicated that his radiology expert would testify that Dr. Junck fell below the standard of care in not immediately reporting the CT scan findings to him. Also during discovery, the hospital indicated that its cardiology expert would testify that Dr. Liguori fell below the standard of care by failing to make a timely diagnosis.

In addition, Dr. Liguori answered plaintiffs' uniform interrogatory number 19 ("interrogatory 19") as follows:

19. Is it your contention that the plaintiff(s)' injuries were caused in whole or in part by the fault of some person or persons other than yourself, whether named as a defendant in this action or not, or that some such other person or persons may have or share in the legal responsibility for the injuries set forth in plaintiff(s)' complaint? Yes If so, state:

a. The name and present address of each such person or entity;

Dr. Neal Junck, Radiologist

b. Each act or omission by which you contend such person is at fault for causing the plaintiff's [sic] injuries:

It is Defendant's position that any alleged delay in diagnosing Mr. Gordon's dissection probably did not play a causative role in his death. However, in the event there is evidence presented that it did, Defendant contends that Dr. Junck contributed to the delay by not advising Dr. Liguori of the abnormal CT scan, in accordance with Dr. Liguori's specific request, which failure resulted in an approximate 12–hours [sic] delay. The specific acts or omissions were misinterpreting the CT scan and/or failing to communicate with Dr. Liguori.

Approximately three weeks before trial, the hospital's attorney disclosed that the hospital would call its cardiology expert only if Dr. Liguori settled out of the case prior to the verdict. During the week before trial, Dr. Liguori filed a motion *in limine* to preclude plaintiffs from introducing any evidence concerning the defendants' contingent expert witnesses. He stated in the motion that, if the case went to trial with both defendants still in the case, neither defendant intended to call their standard of care experts to testify against the other. Also, in the joint pretrial statement, defendants did not list either standard of care expert as a witness.

The court granted Dr. Liguori's motion *in limine,* deciding that the plaintiffs could not comment on the defendants' experts' failure to testify. In addition, when queried by plaintiffs' attorney regarding the introduction at trial of Dr. Liguori's answer to interrogatory 19, the court stated: "I don't think that would be proper to let you get up and read

that Interrogatory. I would say no at this point."

At trial, plaintiffs did not attempt to introduce Dr. Liguori's answer to interrogatory 19. Following trial, the jury returned a verdict in favor of both defendants. Plaintiffs then moved for a new trial, arguing that the trial court had erred in preventing plaintiffs from commenting on defendants' retention of standard of care expert witnesses to testify against one another, and from reading Dr. Liguori's answer to interrogatory 19. The court denied the motion and plaintiffs timely appealed the judgment and the denial of their motion for new trial.

## STANDARD OF REVIEW

■ The trial court's rulings regarding admission or exclusion of evidence will not be disturbed on appeal absent a clear abuse of discretion and resulting prejudice. *Schwartz v. Farmers Ins. Co.*, 166 Ariz. 33, 37, 800 P.2d 20, 24 (App.1990).

## DISCUSSION

### I.

Plaintiffs argue on appeal that the trial court erred in prohibiting them from offering evidence that defendants had reached an undisclosed agreement to not present evidence of each other's negligence. Plaintiffs maintain that defendants' failure to disclose their agreement until three weeks before trial "cast the adversarial conduct of the parties at trial into a virtual tailspin," interfered with possible settlement, and worked a fraud upon the court. Defendants respond that the record contains no evidence of an agreement between them, and that, in any event, plaintiffs failed to offer such evidence at trial.

■ Defendants are correct that plaintiffs did not specifically ask the court, either in their response to defendants' motion *in limine* or their motion for a new trial, for permission to offer evidence of such an agreement. Nor did they offer such evidence at trial. Instead, they merely asked to comment on each defendant's failure to present their retained expert's testimony that the other defendant was at fault. The court,

therefore, could not have erred because this issue was never presented to it.

■ Notwithstanding, even if plaintiffs had properly raised this issue below, the court's ruling would have been correct. Plaintiffs cite only *Mustang Equip., Inc. v. Welch*, 115 Ariz. 206, 564 P.2d 895 (1977), in support of their argument. *Mustang* involved a "Gallagher agreement," under which a plaintiff agrees not to execute on the judgment against a codefendant. The court in *Mustang* held that, even in the absence of fraud or collusion, the Gallagher agreement was unenforceable because it had not been disclosed prior to trial. Such nondisclosure was critical because it adversely affected the possibility of settlement, since the non-agreeing codefendant would likely have been more receptive to a settlement had it known that it would be solely responsible for any judgment entered against both defendants.

*Mustang*, however, is inapplicable here because these defendants disclosed their agreement at least one week before trial, and even the Gallagher agreement in *Mustang* would have been upheld had it been similarly disclosed. *See id.* at 210–11, 564 P.2d 895. Unlike *Mustang*, plaintiffs here had prior notice of defendants' trial strategy and the opportunity to settle before trial.

Moreover, the agreement in the instant case neither affected the integrity of the trial nor upset the adversarial relationship of the parties because it was between both codefendants and not between the plaintiff and one codefendant. Defendants' motivation to vigorously defend at trial remained unaffected; they merely opted for one defense strategy over another. Furthermore, this agreement could not have caused plaintiffs to minimize their claims against one codefendant at the expense of the other. Thus, unlike some Gallagher agreements, this agreement did not involve the potential for fraud or collusion. Consequently, it would not have been error for the court to preclude evidence of the subject agreement even if the issue had been properly raised.

### II.

■ Plaintiffs next argue that the trial court erred in not allowing them to offer

evidence of the opinions of the uncalled experts or to comment on defendants' failure to call these experts at trial. They argue that the court thus precluded them from introducing the most compelling evidence of each defendant's negligence.

■ We note that only under limited circumstances may the trier of fact draw an adverse inference from the failure to present testimony. *Ponce v. Industrial Comm'n,* 120 Ariz. 134, 136, 584 P.2d 598, 600 (App.1978). Some factors to be considered by the trial court when deciding whether comment regarding an uncalled witness is proper are: (1) whether the witness was under the control of the party who failed to call him or her, *Krek v. Briel,* 3 Ariz.App. 126, 128, 412 P.2d 301, 303 (1966); (2) whether the party failed to call a seemingly available witness whose testimony it would naturally be expected to produce if it were favorable, *id.; Ray Korte Chevrolet v. Simmons,* 117 Ariz. 202, 208, 571 P.2d 699, 705 (App.1977); and (3) whether the existence or nonexistence of a certain fact is uniquely within the knowledge of the witness, *Ponce,* 120 Ariz. at 136, 584 P.2d at 600 (citing *Starkweather v. Conner,* 44 Ariz. 369, 377, 38 P.2d 311, 314 (1934)).

While defendants' uncalled expert witnesses arguably meet the first two factors outlined above, they clearly do not meet the third. First of all, the testimony at issue here involves opinion, not fact. Second, an opinion concerning the negligence of either defendant was not uniquely within the knowledge of either expert. Plaintiffs called their own standard of care experts who had similar opinions. Under the Uniform Medical Malpractice Rules, plaintiffs were not entitled to offer testimony of additional expert witnesses. 17B A.R.S. Uniform Medical Malpractice Rule 1(D)(4). The real purpose of this evidence appears to be the placing of the defendants, through their own experts, at odds with each other. Under these circumstances, the trial court's ruling was not an abuse of discretion.

In reaching this conclusion, we have considered the only case appellants cite in support of their argument. *See U.S. v. Mahone,* 537 F.2d 922 (7th Cir.1976), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976). In *Mahone,* four police officers were present during the seizure of a shotgun, but the government called only three of them to testify. The trial court denied defendant's request for an instruction that would have informed the jury that it could draw an inference that the fourth officer's testimony would have been unfavorable to the government, and denied defendant's request to comment on the government's failure to call the fourth officer. On appeal, the *Mahone* court held that, because it was unclear whether the fourth officer's testimony would have been cumulative and irrelevant, the trial judge had not abused his discretion by not giving the absent witness instruction, but it further ruled that the trial judge had erred by not allowing the defense attorney to comment on the government's failure to call the fourth officer.

*Mahone,* however, is distinguishable from the instant case. In *Mahone,* the jury knew that four officers were involved but that only three had testified. By contrast, in the instant case, because defendants did not call the subject experts, the jury knew nothing about them and there was no need to explain why they did not testify. *See Spraker v. Lankin,* 218 Kan. 609, 545 P.2d 352, 357 (1976) (court should not have permitted defense counsel to comment on plaintiff's failure to call expert witness where plaintiff had consulted expert but had not designated the expert as a witness in the case nor mentioned him at trial). Moreover, in *Mahone,* the officer who was not called was an eye-witness to the subject event. Here, the uncalled witnesses were not eye-witnesses but were experts engaged to support possible defense theories. They were not witnesses to facts of any kind; rather, their testimony would have been strictly limited to their opinions. *Mahone,* therefore, is inapposite.

Accordingly, we conclude that the trial court did not abuse its discretion in not permitting plaintiffs either to offer evidence of the uncalled experts' opinions or to comment on defendants' failure to call their experts at trial.

### III.

■ Plaintiffs last argue that the trial court erred by rejecting their request to

introduce Dr. Liguori's answer to interrogatory 19, either as an admission of a party opponent or an impeachment of Dr. Liguori's testimony. Defendants respond that plaintiffs neither attempted to offer the answer into evidence nor moved the court to permit its admission, and that the issue therefore has not been preserved for appeal.

At the pretrial motion argument, plaintiffs' attorney asked the court whether, in the event it had decided to preclude him from commenting on defendants' nontestifying experts, it would allow him to read the answer to interrogatory 19 in order to show defendants' accusations against each other. After argument, the following exchange occurred:

> [PLAINTIFFS' COUNSEL]: May I ask, Your Honor, in terms of the Interrogatory Answers, specifically the one that says are you going to point the finger at anybody else—
>
> THE COURT: I don't think that would be proper to let you get up and read that Interrogatory. I would say no at this point.
>
> [PLAINTIFFS' COUNSEL]: That's final? I simply want to make a record. I think that is prejudicing my case, these admissions by these defendants, and I should be permitted to read from that, not unlike what they would like to do if I had admissions in my Interrogatory Answers.

The court responded "The record would show," but then digressed, never clarifying whether its ruling was final.

Although plaintiffs did not attempt to introduce the interrogatory answer at trial to clarify the ruling, they did argue in their motion for new trial that the court erred in not allowing them to read it to the jury. In their response to the motion for new trial, defendants did not assert that plaintiffs had waived the issue by not trying to introduce the interrogatory answer at trial. We therefore conclude that this issue was preserved below.

■■■ Rule 33(b), Arizona Rules of Civil Procedure, provides that interrogatory "answers may be used to the extent permitted by the rules of evidence." A party's answers to interrogatories may be introduced into evidence against that party as admissions. *Barrett v. Melton,* 112 Ariz. 605, 607, 545 P.2d 421, 423 (1976); *see also* Ariz.R.Evid. 801(d)(2). Defendants argue, however, that Dr. Liguori's interrogatory answer was not an admission but merely a statement in the alternative, made only to preserve his right to assert someone else's fault as a potential defense.

The parties cite no Arizona cases on point nor have we discovered any through our own research. Defendants, however, cite two federal cases involving situations very similar to the instant case in which the courts found that the interrogatory answers were inadmissible as admissions. *See McNeese v. Reading & Bates Drilling Co.,* 749 F.2d 270 (5th Cir.1985); *Douglas Equip., Inc. v. Mack Trucks, Inc.,* 471 F.2d 222 (7th Cir.1972). In *McNeese,* the court found no abuse of discretion in the trial court's refusal to admit the plaintiff's interrogatory answer because the answer was in the form of an alternative pleading rather than an admission. Similarly, the *Douglas* court found no abuse of discretion in the trial court's refusal to admit the defendant's interrogatory answer because it was conditioned upon the hypothetical establishment of the defendant's liability, a disputed issue. *See also Gadaleta v. Nederlandsch–Amerekaansche Stoomvart,* 291 F.2d 212, 213 (2d Cir.1961) (noting that, although interrogatory answers are admissible as admissions, answers contingent upon the establishment of a disputed condition may be excluded).

We find these federal cases persuasive and conclude that Dr. Liguori's answer to interrogatory 19 was not an admission but, rather, a statement in the nature of an alternative or contingent pleading. The interrogatory answer does not state that the delay in diagnosis caused Gordon's death nor that Dr. Junck was responsible for any delay. Instead, the answer is framed in the alternative: a) a delay in diagnosis probably did not cause Gordon's death; b) if, however, evidence were presented to the contrary, Dr. Junck contributed to the delay. The court in *Douglas* found that the admission of such answers, which are conditioned on the establishment of underlying facts or legal conclusions that

are not admitted to by the answering party, would be misleading to the jury. *Douglas,* 471 F.2d at 225 (citing *Gadaleta,* 291 F.2d at 213). We agree. The purpose of the interrogatory answer was not to make an affirmative statement, but to give notice of a potential argument should a particular hypothetical event occur. As the *Douglas* court observed, the admission of such an answer could be misleading to the jury. The trial court, therefore, did not err in denying plaintiffs' request to read the answer to the jury.

We also stress that Arizona has a policy of encouraging open and full disclosure during discovery. To admit contingent interrogatory answers, without the subject contingency having come to pass, would undermine this policy. It would allow the party's contingent answers to be introduced as independent evidence of disputed facts. That result would effectively punish full disclosure. We therefore conclude that the trial court did not err in ruling that plaintiffs could not read the interrogatory answer to the jury.

Plaintiffs also argue that they should have been allowed to use the interrogatory answer to impeach Dr. Liguori. The trial court's ruling, however, was limited to denying plaintiffs the right to read the answer to the jury. Plaintiffs never attempted to use the answer for impeachment, and the trial court did not rule that it could not be used for that purpose. In any event, plaintiffs never had the opportunity to impeach Dr. Liguori on this matter because he never testified about it at trial. The trial court therefore did not err in denying plaintiffs' proposed use of Dr. Liguori's answer to interrogatory 19.

## CONCLUSION

We conclude that the trial court did not abuse its discretion in any of its evidentiary rulings. Accordingly, we affirm the judgment.

VOSS and CONTRERAS, JJ., concur.