IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

WENDY LORENZ and ROBERT LORENZ, husband and wife,
*Plaintiffs/Appellants*,

*v.*

STATE OF ARIZONA, a body politic; CLARENCE H. CARTER, Director,
ARIZONA DEPARTMENT OF ECONOMIC SECURITY, and JANE DOE
CARTER, husband and wife; BRAD HJALMARSON and JANE DOE
HJALMARSON, husband and wife; ALVIN ROMERO and JANE DOE
ROMERO, husband and wife; CHRISTIE ORONA and JOHN DOE
ORONA, husband and wife; *Defendants/Appellees*.

No. 1 CA-CV 14-0607
FILED 12-8-2015

Appeal from the Superior Court in Maricopa County
No. CV 2013-014617
The Honorable David O. Cunanan, Judge

**AFFIRMED**

COUNSEL

David J. Martin, Attorney at Law, PLLC, Lakeside
By David Joseph Martin
*Counsel for Plaintiffs/Appellants*

Arizona Attorney General's Office, Phoenix
By Brock J. Heathcotte
*Counsel for Defendants/Appellees*

## OPINION

Presiding Judge Margaret H. Downie delivered the Opinion of the Court, in which Judge Patricia A. Orozco and Judge Maurice Portley joined.

**D O W N I E**, Judge:

**¶1**   Wendy and Robert Lorenz ("Grandparents") appeal the dismissal of their civil complaint against the Department of Child Safety ("DCS"), formerly known as the Department of Economic Security, and several DCS employees (collectively, "Appellees"). Grandparents contend certain statutes, regulatory provisions, and administrative policies give rise to a civil duty by DCS to grandparents who wish to have dependent grandchildren placed in their care. Because the cited authorities reveal an intent to protect and benefit dependent children, not potential foster or adoptive placements, we affirm the superior court's judgment.

### FACTS AND PROCEDURAL HISTORY[1]

**¶2**   Wendy Lorenz is the paternal grandmother of E.C. ("Child"), who was born in 2008 to S.W. ("Mother") and P.S. ("Father"). After Child's birth, Mother signed a 90-day voluntary foster care agreement with DCS. *Wendy L. v. Ariz. Dep't of Econ. Sec.*, 1 CA-JV 12-0108, 2013 WL 357582, at *1, ¶ 3 (Ariz. App. Jan. 29, 2013) (mem. decision).

**¶3**   DCS placed Child with J.C. and P.C. ("foster parents"). *Id.* Wendy visited Child twice at the foster parents' home. *Id.* at ¶ 4. DCS advised Wendy she could not have further contact unless her son established paternity. *Id.* A caseworker informed Wendy that her son must obtain a paternity test, which he did. *Id.* Wendy provided the test results to DCS, but the agency rejected them "for reasons not completely

---

[1]  Our recitation of facts is based on the allegations of the complaint, *see Logan v. Forever Living Products Int'l, Inc.*, 203 Ariz. 191, 192, ¶ 2 (2002), as well as this Court's decision in *Wendy L. v. Ariz. Dep't of Econ. Sec.*, 1 CA-JV 12-0108, 2013 WL 357582, at *3, ¶ 13 (Ariz. App. Jan. 29, 2013) (mem. decision).

clear from the record, but which appear to relate, at least in part, to chain of custody." *Id.*

¶4 DCS filed a dependency petition in August 2008, stating that it had "attempted to identify and assist placement with the child's grandparent or extended family" but that such a placement "is not in the child's best interests because relative placement search is ongoing." Grandparents allege DCS did not disclose their interest or involvement to the juvenile court.

¶5 Grandparents moved out of the country in October 2008 due to previously accepted employment. In November 2008, Child was found dependent, and later that month, DCS received the results of a court-ordered paternity test, which established Father's paternity. *Id.* at *2, ¶ 5. DCS did not contact Grandparents to determine if they were interested in becoming Child's placement, *id.*, and Grandparents contend DCS misled the juvenile court by stating that no family placement was available.[2]

¶6 In April 2009, DCS invited the foster parents to adopt Child and told them no family members had come forward. *Id.* at ¶ 6. As of that date, DCS had made no effort to contact Wendy or consider Grandparents as an adoptive placement; nor had Wendy contacted DCS since October 2008. *Id.* In May 2009, Wendy left a message for the assigned caseworker, who did not return her call. *Id.* at ¶ 7. Grandparents allege the progress reports DCS submitted to the juvenile court "failed to describe the contacts that had occurred between Wendy and Child, nor the efforts by Wendy to contact [DCS]."

¶7 The juvenile court changed the case plan from reunification to severance and adoption in June 2009. *Id.* Grandparents successfully moved to intervene and expressed their interest in adopting Child. *Id.* at ¶ 8. In July 2009, Mother and Father consented to termination of their parental rights. *Id.* Wendy returned to Arizona the next month to pursue Child's placement and adoption. *Id.*

¶8 In 2011, Grandparents and the foster parents filed separate adoption petitions. *Id.* at ¶ 9. After a four-day contested hearing, the juvenile court granted the adoptive parents' petition. *Id.* Grandparents appealed that ruling, but this Court affirmed the juvenile court's decision.

---

[2] A DCS caseworker later testified, "I don't think we remembered that [Wendy] was involved in the case."

**¶9** Grandparents subsequently filed the civil complaint at issue in these proceedings, alleging deprivation of federal constitutional rights (count one), negligence (count two), and deprivation of state constitutional rights (count three). The case was removed to federal court, where Appellees moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) (subject matter jurisdiction) and 12(b)(6) (failure to state a claim upon which relief can be granted). The federal court dismissed counts one and three but remanded count two to state court. On remand, the superior court dismissed the negligence claims under Arizona Rule of Civil Procedure 12(b)(6). Grandparents timely appealed.

## DISCUSSION

**¶10** We review the superior court's dismissal order *de novo*. *See Coleman v. City of Mesa,* 230 Ariz. 352, 355, ¶ 7 (2012). "We will uphold dismissal only if the plaintiff would not be entitled to relief under any facts susceptible of proof in the statement of the claim." *Dressler v. Morrison*, 212 Ariz. 279, 281, ¶ 11 (2006). We will affirm the superior court's ruling if it was correct for any reason. *Ariz. Bd. of Regents v. State ex rel. Ariz. Pub. Safety Ret. Fund Manager*, 160 Ariz. 150, 154 (App. 1989).

**¶11** A plaintiff alleging negligence must establish: (1) a duty, (2) breach of duty, (3) causation, and (4) damages. *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285, 294, ¶ 29 (App. 1999). "The existence of a duty is a question of law that we review de novo." *Gilbert Tuscany Lender, LLC v. Wells Fargo Bank*, 232 Ariz. 598, 601, ¶ 11 (App. 2013). "Whether the defendant owes the plaintiff a duty of care is a threshold issue; absent some duty, an action for negligence cannot be maintained." *Sullivan v. Pulte Home Corp.*, 237 Ariz. 547, 549, ¶ 6 (App. 2015).

**¶12** Grandparents allege DCS has "a nondelegable duty to provide for appropriate and lawful placement of dependent children with grandparents if adoption is contemplated." According to Grandparents, DCS' duty arises from statutes and regulations governing juvenile dependency and severance proceedings, as well as from placement preferences for dependent children that are set forth in an internal agency manual. We disagree.

**¶13** "A statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Id.* at 550, ¶ 9. "When a court decides that a violation of a statute shall be considered in

determining liability for negligence, the motivation for doing so is to give effect to the will of the legislature." *Id.* at 552, ¶ 14 (quoting *Jackson v. City of Seattle*, 158 Wash. App. 647, 655, ¶ 16 (2010)).

¶14 The Arizona legislature has decreed that the "primary purpose" of DCS is to protect children. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-451(B). Consistent with this overarching purpose, each of the statutes and regulations Grandparents cite makes clear that the intent is to protect dependent children, not the interests of potential foster or adoptive placements.

¶15 A.R.S. § 8-514(B), for example, directs DCS to place a dependent child "in the least restrictive type of placement available, *consistent with the needs of the child*," and it lists placement preferences, in order, as: (1) parents; (2) grandparents; (3) kinship care with extended family; (4) licensed family foster care; (5) therapeutic foster care; (6) group home; and (7) residential treatment facility. (Emphasis added.) We have previously held that A.R.S. § 8-514(B) delineates preferences, not mandates. *Antonio P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 402, 405, ¶ 12 (App. 2008). More fundamentally, the statute expresses a legislative intent to protect "the needs of the child," not the identified placements.

¶16 Grandparents' reliance on A.R.S. § 8-103(B) is similarly unavailing. That statute requires DCS to "place a child in an adoptive home that best meets the safety, social, emotional, physical and mental health needs of the child," and it lists relevant factors to consider, such as "[e]stablished relationships between the child and the prospective adoptive family . . . including placement with a grandparent or . . . foster parent who has a significant relationship with the child." A.R.S. § 8-103(B). The enumerated factors are listed "in no order of preference," *id.*, and, once again, the legislature has made clear that the interests the statute is designed to protect are those of dependent children, not potential placements.

¶17 Grandparents also cite A.R.S. § 8-514.03, which establishes a kinship foster care program to "promote the placement of the child with the child's relative." The dispositive inquiry under this statute is whether a kinship placement "is able to meet the child's health and safety needs," and whether such a placement is "in the best interest of the child." A.R.S. § 8-514.03(B), (C). Nothing in the statute suggests that relatives are the intended beneficiaries of the kinship foster care program or that the program was designed to protect potential placements "against the risk of

the type of harm which has in fact occurred." *Sullivan*, 237 Ariz. at 550, ¶ 9.

**¶18** According to Grandparents, "the most compelling legally created duty" arises from Arizona Administrative Code ("A.A.C.") R6-5-6614. That provision, entitled "Placement Determination," states, in relevant part:

> **D.** In an agency placement adoption, an adoption entity shall place an adoptable child in the adoptive setting *which best meets the child's needs*. In determining who can best meet the needs, the adoption entity shall consider all relevant factors, including, without limitation: . . .
>
> 2. Family relationships between the child and the adoptive family members;
>
> . . .
>
> 6. The availability of relatives, the adoptable child's former foster parents, or other significant persons to provide support to the adoptive family and child. . . .

A.A.C. R6-5-6614(D) (emphasis added). As with the statutes discussed *supra*, this regulation makes clear that it is intended to protect and further the best interests of dependent children, not the listed categories of potential placements.

**¶19** Grandparents' reliance on an internal DCS manual is even less persuasive. The DCS Service Manual states, in pertinent part:

> The ability of the family to meet the child's needs shall govern the selection of an adoptive family. No single factor shall be the sole determining factor in the selection of a family. [DCS'] order of placement preference . . . is:
>
> - grandparent;
>
> - kinship care . . . ;
>
> - non-relatives without a prior relationship to the child.

The DCS manual does not provide a basis for imposing public policy-based tort duties. *See*, *e.g.*, *Monroe v. Basis Sch., Inc.*, 234 Ariz. 155, 160, ¶ 15 (App. 2014) (Because state agency guidelines were not implemented as

formal rules, they "cannot be construed as rules or regulations, nor do they have the force and effect of law."). But even if it were of sufficient legal stature to give rise to a tort duty, as with the statutes and administrative regulation discussed *supra*, the manual makes clear that its intent is to "meet the child's needs," not to protect the class of persons to which Grandparents belong — i.e., prospective placements.

**¶20** Because Grandparents failed to establish the existence of a legal duty owed to them by DCS, the superior court properly dismissed their negligence claims.

## CONCLUSION[3]

**¶21** For the reasons stated, we affirm the judgment of the superior court.



Ruth A. Willingham · Clerk of the Court
FILED: ama

---

[3] To the extent Grandparents attempt to re-urge their constitutional claims, such arguments are foreclosed by the federal court's unappealed dismissal of their state and federal constitutional claims.