NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

JESSICA PLOOF, *Plaintiff/Appellant*,

*v.*

JAMES THAL, *Defendant/Appellee*.

No. 1 CA-CV 23-0065
FILED 11-7-2023

---

Appeal from the Superior Court in Maricopa County
No. CV2020-017046
The Honorable Joan M. Sinclair, Judge

**AFFIRMED**

---

COUNSEL

Mills + Woods Law PLLC, Phoenix
By Thomas A. Connelly, Robert T. Mills, Sean A. Woods
*Co-Counsel for Plaintiff/Appellant*

Gillespie, Shields & Taylor, Phoenix
By DeeAn Gillespie Strub, Mark Shields
*Co-Counsel for Plaintiff/Appellant*

Weinberg Wheeler Hudgins Gunn & Dial LLC, Phoenix
By Jeffrey S. Hunter
*Counsel for Defendant/Appellee*

---

**MEMORANDUM DECISION**

Judge Jennifer M. Perkins delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe and Judge Daniel J. Kiley joined.

---

**P E R K I N S**, Judge:

¶1          Jessica Ploof appeals the superior court's grant of summary judgment to Dr. James Thal. For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2          On review from a grant of summary judgment, we consider the facts in a light most favorable to the non-movant. *Lowrey v. Montgomery Kone, Inc.*, 202 Ariz. 190, 191, ¶ 2 n.1 (App. 2002).

¶3          Jessica, the mother of Henry (a pseudonym), has an IQ of 65 and is intellectually disabled. Jessica and Henry lived with Jessica's mother, Brendi Ploof, who assisted Jessica in caring for Henry. In December 2016, the Arizona Department of Child Safety ("DCS") received two anonymous tips that Jessica was neglecting Henry, and that their home was unsafe.

¶4          DCS investigated these tips and found Henry "free from any visible injuries, . . . dressed appropriately," and that "[t]he home was free from any safety hazards." DCS found no reason to remove Henry from Jessica's care.

¶5          During the investigation, DCS asked Jessica to submit to a drug test. She complied and tested positive for alcohol, marijuana, and methamphetamine. DCS then held a Team Decision Meeting in January 2017 to create a safety plan for Henry. Jessica agreed to participate in substance abuse treatment and parenting classes, and Brendi agreed to submit to a drug test the next day.

¶6          The next day, Brendi's employer called her into work, so she was unable to submit to the drug test. She called DCS and explained that she would undergo the screening as soon as possible. Later that day, without seeking a warrant or court order, DCS removed Henry from the home.

**¶7** Jessica did not understand why DCS had taken Henry, but she participated in DCS's prescribed substance abuse treatment, regular drug testing, and psychological evaluations. Jessica stayed clean throughout her participation in the DCS programs.

**¶8** DCS retained Thal, a licensed psychologist, to evaluate Jessica's mental health and parental fitness. Thal evaluated Jessica on July 18, 2017, and October 10, 2018. At each evaluation, Jessica signed a Client Informed Consent Form stating she had "been referred to [Thal] by [DCS] for a psychological evaluation of [her] mental health and parenting fitness."

**¶9** In Thal's first evaluation, he found that "[t]here are significant limits on how much information [Jessica] can process and retain." His report suggested that Jessica should "serve in the capacity of co-parent." And in his second evaluation, Thal found that Jessica "is an intellectually disabled young woman who has substantial difficulty with concepts, timeframes, and retaining factual information."

**¶10** Thal also evaluated Brendi's mental health and ability to serve as a suitable placement for Henry in January 2018. Thal's evaluation recommended a co-parenting arrangement between Jessica and Brendi. This evaluation did not include any mention of health concerns for Henry. He concluded there would not be any risk to Henry in Brendi's care. His ultimate recommendation included that it would be "appropriate for [Brendi] to seek a permanent guardianship of [Henry]."

**¶11** Thal sent this report to Henry's current and former DCS case managers. Later that month, Thal received a call from Henry's former case manager who outlined various concerns about placement in Brendi's residence. Thal then amended his evaluation and asked the current case manager "to shred the original report." He informed the current case manager that the amended report comports with the former case manager's concerns and represents his complete evaluation of Brendi.

**¶12** The main text of the original report remained substantially unchanged in the amended report. Thal still concluded that Brendi "would appear to be a particularly suitable long-term placement for [Henry]." But he recommended placement outside of Brendi's care due to concerns for Henry's health and well-being.

**¶13** DCS petitioned to terminate Jessica's parental rights in August 2018, and the juvenile court granted the petition in July 2019. Jessica filed a complaint against DCS and its agents ("State Defendants"), as well as Thal, in December 2020, alleging federal and state law violations.

Jessica's claims against the State Defendants are not before us. The superior court granted summary judgment on Jessica's negligence claim against Thal, finding that Thal did not owe a duty to Jessica and her claim against Thal was time-barred. Jessica appealed from that decision and we have jurisdiction. A.R.S. § 12-2101(A).

## DISCUSSION

**¶14** Summary judgment is appropriate when no genuine issue of material fact exists, and the questions can be resolved on the law. Ariz. R. Civ. P. 56(a); *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990). We review grants of summary judgment *de novo*, considering any facts and inferences in the light most favorable to the nonmoving party. *Tierra Ranchos Homeowners Ass'n v. Kitchukov*, 216 Ariz. 195, 199, ¶ 15 (App. 2007).

## I.     Negligence

**¶15** Negligence requires proof of four elements: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9 (2007).

**¶16** Whether a duty exists is a question of law we review *de novo*. *Id.* "Duty is defined as an obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Id.* at ¶ 10 (cleaned up). A duty arises from special relationships that are either created by public policy or recognized in common law. *Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565, ¶ 14 (2018). Jessica alleges a duty based on both public policy and a common law special relationship.

## A. There is no special relationship created by public policy.

**¶17** Jessica contends that a parent's constitutional and statutory rights create a public policy sourced special relationship giving rise to Thal's duty. She proposes that due process "error-reducing" procedural protections impose a duty on Thal. *See Santosky v. Kramer*, 455 U.S. 745, 760–61, 769–70 (1982) (due process requires the state to prove its allegations in termination proceedings by "clear and convincing evidence"). And she points to Section 8-456, a statute governing DCS training procedures, as the source of such protections.

**¶18**      "The liberty of parents to direct the upbringing . . . of their children is a fundamental right." A.R.S. § 1-601(A). But "the state possesses a vital interest in the ongoing status of the parent-child relationship" and thus "has the power to intrude into the parent-child relationship to protect the welfare of the child and the state's own interest in the welfare of its citizens." *Brionna v. Dep't of Child Safety*, 255 Ariz. 471, 476, ¶ 18 (2023) (cleaned up). The legislature created DCS to protect the welfare of children. *See* A.R.S. § 8-451(A), (B). And DCS investigates abuse reports, relies on experts, and provides services to children and families to achieve this purpose. *See* A.R.S. § 8-451(B). In other words, based on the plain text of the statutory scheme, the legislature crafted it to protect children, not to protect parents and their recourse under tort law. *See Lorenz v. State*, 238 Ariz. 556, 558, ¶¶ 13–14 (App. 2015) (concluding the DCS statutory scheme does not impose a public policy-based tort duty).

**¶19**      The specific provision to which Jessica points is limited in its scope. *See* A.R.S. § 8-456(A) ("[DCS] shall train all *investigators* in forensic interviewing and processes," which must include, "[t]he duty to protect the legal and due process rights of children and families.") (emphasis added). The statute does not textually contemplate an independent psychologist's tort liability. And Thal acted only as an independent medical evaluator, not an "employee of the department who investigates allegations of abuse or neglect pursuant to a DCS report." A.R.S. § 8-456(K)(2) (defining "Investigator" for this section).

**¶20**      It is within the juvenile court's purview to determine the reasonableness of DCS's investigation, including the reliability and credibility of experts. Neither the U.S. Constitution nor Arizona statutes create a tort duty toward parents for independent psychologists retained by DCS to evaluate parental fitness.

## B. There is no common law recognized special relationship.

**¶21**      Jessica argues that even though no formal doctor-patient relationship exists, we may still find that Thal owed her a duty based in common law. She points to *Stanley v. McCarver*, in which our supreme court recognized a duty owed by a radiologist to a patient despite the absence of a formal doctor-patient relationship. 208 Ariz. 219, 223, ¶ 14 (2004).

**¶22**      A formal doctor-patient relationship "is not the only source of a doctor's duty toward a patient," but there is no duty when "the doctor has no intent to treat, care for or otherwise benefit the [examinee]." *Ritchie v. Krasner*, 221 Ariz. 288, 295–96, ¶ 13 (App. 2009) (cleaned up). And a duty

based on a special relationship is limited to "risks that arise within the scope of the relationship." *Dinsmoor v. City of Phoenix*, 251 Ariz. 370, 374, ¶ 17 (2021).

**¶23**     Jessica does not argue Thal was negligent in his evaluation of her; indeed, she implicitly acknowledges the accuracy of his evaluations by citing them as proof that she has an intellectual disability subject to the Americans with Disabilities Act. Instead, she asserts that Thal acted negligently by altering his evaluation of Brendi's parental fitness. But Thal's evaluation of Brendi is outside the scope of Jessica's doctor-examinee relationship with Thal. *See id.*

**¶24**     Jessica nevertheless contends that we should weigh the factors found in *Stanley* to determine whether Thal owed her a duty. But *Stanley* addresses whether the relationship between a doctor and his examinee is sufficient to establish a duty toward that examinee. 208 Ariz. at 222–23, ¶¶ 10–12. Here, Brendi was the examinee relevant to Thal's alleged problematic conduct. Even if Thal owed Jessica a duty of care in how he conducted his evaluation of her, that duty was limited to their doctor-examinee relationship and does not give rise to a duty based on Thal's separate examination of Brendi. *See Dinsmoor*, 251 Ariz. at 374, ¶ 17.

**¶25**     The superior court did not err in concluding that Thal owed Jessica no tort duty under these circumstances.

**¶26**     Because Thal did not owe a duty to Jessica, and thus the court properly granted summary judgment for that reason, we need not address whether the superior court erred in granting summary judgment on the statute of limitations ground.

## CONCLUSION

**¶27**     We affirm and we award taxable costs to Thal upon compliance with ARCAP 21.

