NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO D.T.

No. 1 CA-JV 25-0021

FILED 08-05-2025

Appeal from the Superior Court in Maricopa County
No. JD533384
The Honorable Jay M. Polk, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee*

Maricopa County Public Advocate, Mesa
By Seth Draper
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge David B. Gass delivered the decision of the court, in which
Judge Michael J. Brown and Judge Andrew J. Becke joined.

**G A S S**, Judge:

**¶1**        This appeal involves a 5-year-old child who was 4 months old when the child came into the care of the Department of Child Safety (DCS). After nearly 3 years of litigation, father consented to the superior court terminating his parental rights. In the almost 2 years since giving his consent, father has brought 2 motions to set aside the termination order and pursued 2 appeals. In his first motion and first appeal, father unsuccessfully sought relief from the termination order based on untimely disclosure of the child's home healthcare services. In this appeal, father challenges the denial of his second motion, asserting DCS committed fraud on the court based on its untimely disclosure of a United States Department of Justice (DOJ) investigation.

**¶2**        The court affirms.

### FACTUAL AND PROCEDURAL HISTORY

**¶3**        In an appeal from an order terminating parental rights, the court views the facts in the light most favorable to affirming the superior court's findings. *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 479 ¶ 32 (2023).

**¶4**        The memorandum decision in father's first appeal from his first motion to set aside discusses the facts underlying the dependency and the termination. *In re D.T.*, 1 CA-JV 23-0192, 2024 WL 1797656 (Ariz. App. Apr. 25, 2024) (mem. decision), (review denied Aug. 19, 2024). Briefly, the child required a feeding tube to eat. In father's care, the child was losing weight and was failing to thrive. Father also missed multiple medical appointments.

**¶5**        DCS began the dependency in May 2020. At that point, the child was 4 months old. The dependency petition alleged father could not care for the child's special needs because of his "cognitive limitations." In June 2022, more than 2 years later, DCS moved to terminate father's rights. The motion to terminate alleged, in part,[1] father was "unable to discharge parental responsibilities because of . . . [a] mental deficiency." *See* A.R.S. § 8-533.B.3. DCS's allegations against father triggered consideration under

---

[1] DCS also moved to terminate father's rights because the child was in an "out-of-home placement for a cumulative total period of fifteen months or longer." *See* A.R.S. § 8-533.B.8(c). Those grounds are not relevant to the issues in this appeal.

the Americans with Disabilities Act (the ADA), which (as explained in paragraphs 7 and 8) form the basis for this appeal.

**¶6**        In response to the motion to terminate, father suggested "the possibility of termination by consent and a Post Adoption Contact Agreement." DCS agreed and amended its motion to terminate "based only on [f]ather's signed consent." Father reviewed the irrevocable adoption consent form with his lawyer and his guardian ad litem, after which father acknowledged signing it "freely and voluntarily and not as a result of any fraud, duress or undue influence (force or trickery)." In August 2023, more than 3 years after the dependency began, the superior court accepted father's knowing and voluntary consent and terminated father's rights to the child.

**¶7**        In April 2023, about 4 months before father consented to the termination, DCS documented a DOJ investigation into whether DCS was discriminating against parents with disabilities, which included asking about father's case. DCS did not disclose its emails about the DOJ investigation to father until December 2024, almost 16 months after father's August 2023 consent. Though DCS did not disclose the emails, DOJ had a representative at 4 superior court hearings before father gave his consent, including the hearing at which he consented. DOJ made its appearance on the record, so father's counsel and guardian ad litem would have known about it.

**¶8**        Father filed his second motion to set aside the termination, arguing DCS committed fraud on the court because DCS did not timely disclose the DOJ investigation.[2] In his motion, father focused his argument on DOJ's final report titled "The United States' Findings and Conclusions from Investigating the State of Arizona's Department of Child Safety under the Americans with Disabilities Act, DJ No. 204-8-264" and dated December 16, 2024. In that report, DOJ concluded DCS violated the ADA by discriminating against parents with disabilities and children with hearing disabilities. Indeed, DOJ used father's case as an example of how DCS denied "parents with disabilities an equal opportunity to show that they can safely parent."

---

[2] The court addressed father's first motion to set aside in *In re D.T.*, 1 CA-JV 23-0192, 2024 WL 1797656 (Ariz. App. Apr. 25, 2024) (mem. decision), (review denied Aug. 19, 2024). In that appeal, father also sought relief based on untimely disclosure but for a different set of documents concerning the child's home healthcare services.

**¶9** In its ruling, the superior court noted DCS timely disclosed those DOJ findings and conclusions. And because DOJ released those findings and conclusions long after father consented, they could not form the basis for father's claim of fraud on the court. After limiting father's claim to DCS's failure to disclose the fact of the DOJ investigation, the superior court ruled father's claim under Juvenile Rule 318(c), Arizona Rules of Procedure for the Juvenile Court, was untimely. The superior court denied father's fraud-on-the-court claim because the untimely disclosure did not constitute fraud on the court.

**¶10** The court has jurisdiction over father's timely appeal of the superior court's denial of his second motion to set aside the termination order under Article VI, Section 9, of the Arizona Constitution, A.R.S. §§ 8-235.A, 12-2101.A.1, and Juvenile Rule 603(a).

## ANALYSIS

**¶11** The court reviews the denial of a motion to set aside for an abuse of discretion. *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 91 ¶ 27 (2019). The superior court abuses its discretion if its decision is "manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Adrian E. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 96, 101 ¶ 15 (App. 2007) (internal quotations omitted).

**¶12** When reviewing for an abuse of discretion, the court must affirm the superior court's ruling if supported by substantial evidence, even if conflicting. *Hurd v. Hurd*, 223 Ariz. 48, 52 ¶ 16 (App. 2009). And the court does not reweigh conflicting evidence. *Id.*

**I.** **The superior court did not err when it ruled father untimely filed his second motion for relief under Juvenile Rule 318(c).**

**¶13** In his second motion, father sought to set aside the termination order under Juvenile Rule 318(c).

**¶14** Juvenile Rule 318(c) directs the court to Civil Rule 60(b) through (d), Arizona Rules of Civil Procedure. Civil Rule 60(b) has 6 grounds on which the superior court may set aside a final order. Ariz. R. Civ. P. 60(b)(1)–(6). Father argues DCS's untimely disclosure "ran afoul of due process" under Civil Rule 60(b)(6). Father also argues the untimely disclosure constitutes a surprise under Civil Rule 60(b)(1) and misconduct under Civil Rule 60(b)(3). Much of father's argument contends DCS's untimely disclosure constituted constructive fraud, which would fall under

4

Civil Rule 60(b)(3)'s "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or other misconduct of an opposing party."

**¶15** Those grounds are subject to specific time limits. Father had to file his motion under Civil Rule 60(b)(1)–(3) grounds "no later than 3 months after entry of the final order." *See* Ariz. R.P. Juv. Ct. 318(c). And father had to file his motion under Civil Rule 60(b)(4)–(6) grounds "within a reasonable time but no later than 6 months after entry of the final order." *Id.*

**¶16** Father did not. Instead, he filed his second motion to set aside the termination order in December 2024—15 months after the superior court's September 2023 order terminating his parental rights. Juvenile Rule 318(c) bars his motion no matter which ground he sought relief under. Father filed his motion more than 6 months after the superior court entered the final order. And the analysis does not change because father learned about the alleged grounds after the time limits had passed. *See McKernan v. Dupont*, 192 Ariz. 550, 554 ¶ 13 (App. 1998) (requiring motion for relief under Civil Rule 60 be filed within time limits after the judgment entered, not after the movant discovered the grounds).

**¶17** Father argues the time limits in Juvenile Rule 318(c) are "not [] hard limit[s]." *See Angelica R. v. Popko*, 253 Ariz. 84, 88 ¶¶ 11–12 (App. 2022). In *Angelica R.*, the father alleged the mother fraudulently told the superior court the father signed the form consenting to the termination. *Id.* at 87 ¶¶ 4–7. The superior court found the father knew nothing about the mother's action to strip his parental rights by signing the consent form. *Id.* ¶ 21. Though the court in *Angelica R.* left it to the superior court to determine the validity of the parties' factual allegations, it did determine the exception to those limits in Juvenile Rule 318(c) arises when the challenge is based on fraud on the court and voidness, not the grounds in the rule itself. *See id.* at 88, 91 ¶¶ 13, 22. Also, unlike the father in *Angelica R.*, father here reviewed the consent form with his counsel and his guardian ad litem and signed it freely and voluntarily. And so, the time limit in Juvenile Rule 318(c)—no more than 6 months after entry of the final order—applies here, especially because in termination cases, "prompt finality . . . protects the child's interests." *See In re J.S. S-114487*, 179 Ariz. 86, 97 (1994).

**¶18** The superior court thus did not err in finding father's second motion to set aside was untimely under Juvenile Rule 318(c).

**II.** **The superior court did not abuse its discretion when it denied father's request for relief under the superior court's inherent power to set aside the termination order based on alleged constructive fraud on the court.**

**¶19** Father next argues his consent to adoption is revocable because it was "procured through fraud, undue influence, coercion or other improper methods." *See* A.R.S. § 8-106.D ("A consent to adopt is irrevocable unless obtained by fraud, duress or undue influence."). Father relies on fraud, not duress, undue influence, or voidness. Father further does not rely on actual fraud, instead relying on constructive fraud.

**¶20** This court need not decide whether constructive fraud will support a claim of fraud on the court because the superior court made an alternative finding in which it assumed constructive fraud could support father's fraud-on-the-court claim. In that alternative ruling, the superior court found the facts here do not support a constructive fraud claim for 2 reasons. First, the superior court found DCS does not stand in a fiduciary relationship with father. Second, the superior court found father did not show DCS intentionally misled the superior court. Both findings independently support the denial, and both are supported by substantial evidence.

**¶21** Constructive fraud is "a breach of legal or equitable duty" if that breach "tends to deceive others, violates public or private confidences, or injures public interests." *Green v. Lisa Frank, Inc.*, 221 Ariz. 138, 156 ¶ 53 (App. 2009). "[C]onstructive fraud does not require a showing of intent to deceive or dishonesty of purpose." *Id.* (internal quotations omitted). But "it does require a fiduciary or confidential relationship, a breach of duty by the person in the confidential or fiduciary relationship, and that the person in breach induced justifiable reliance by the other to his detriment." *Id.* (cleaned up).

**¶22** In contrast, "[f]raud on the court is a variety of extrinsic fraud." *McNeil v. Hoskyns*, 236 Ariz. 173, 176 ¶ 14 (App. 2014). It applies "when, by fraud, a party has prevented a real contest before the court of the subject matter of the suit, or, put differently, has committed some intentional act or conduct that has prevented the unsuccessful party from having a fair submission of the controversy." *Id.* at 176–77 ¶ 14 (cleaned up); *see also Angelica R.*, 253 Ariz. at 88 ¶ 11.

### A. DCS does not stand in a fiduciary relationship with father.

**¶23** Father argues DCS stands in a fiduciary relationship to parents in dependency and termination matters. *See generally Taeger v. Catholic Fam. & Cmty. Servs.*, 196 Ariz. 285 (App. 1999). Whether one party stands in a fiduciary relationship with another is a fact question. *Id.* at 290 ¶ 12.

**¶24** To begin, father is correct when he says DCS has a duty to make reasonable efforts to preserve the family. That duty arises from 2 sources. First, it arises from statute. *See* A.R.S. § 8-533.B.8, .11. Second, it arises from the parent's fundamental constitutional rights. *See Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581 ¶ 18 (2021). The existence of a duty does not end the analysis.

**¶25** The crux of the case is whether DCS's duty to father is as a fiduciary. Father relies on *Taeger* to argue DCS owes him a fiduciary duty. *See* 196 Ariz. at 290 ¶ 12. Father misplaces his reliance on *Taeger*. *Taeger* did not address a fiduciary relationship between a parent and DCS, a government agency charged with protecting children. Instead, *Taeger* addressed whether a private adoption agency working with potential adoptive parents owed them a fiduciary duty. *Id.* at 291 ¶ 14. In that case, the adoptive agency was not acting at arm's length from the potential adoptive parents. It was responsible for preparing, counseling, and supporting the potential adoptive parents. *Id.* at 292 ¶¶ 18–19. And it had greater knowledge about the birth parent. *Id.* at 291–92 ¶ 16.

**¶26** Unlike an adoption agency's relationship with potential adoptive parents, DCS's duty does not arise out of any fiduciary relationship. *See Lorenz v. State*, 238 Ariz. 556, 558–59 ¶¶ 11–15, 20 (App. 2015). Instead, DCS's duty arises because it is charged with protecting children. *See id.* at 559 ¶ 14. Indeed, DCS's primary duty is to meet children's needs, not to protect or benefit grandparents or potential placements. *See id. Lorenz* concluded the grandparents in that case could not establish DCS owed them a tort-based duty, let alone a fiduciary duty. *See id.* at 559 ¶ 20. Father does not address why this court, in light of *Lorenz*, should rule DCS's duty to father rises to a higher level. And this court finds no reason to do so. Based on *Lorenz*, DCS does not owe father a fiduciary duty. For that reason alone, father cannot establish his claim for constructive fraud.

> **B.** **Father did not show DCS intended to mislead the superior court.**

**¶27** The superior court also did not abuse its discretion when it found father did not show DCS acted "with the intent to mislead the court." *See McNeil*, 236 Ariz. at 177 ¶ 14. Though constructive fraud does not require a showing of intent, fraud on the court does. *See Green*, 221 Ariz. at 156 ¶ 53; *McNeil*, 236 Ariz. at 177 ¶ 14. As the *McNeil* court wrote, fraud on the court occurs "[w]hen a party obtains a judgment by concealing material facts and suppressing the truth with the intent to mislead the court." *McNeil*, 236 Ariz. at 177 ¶ 14 (quoting *Cypress on Sunland Homeowners Ass'n v. Orlandini*, 227 Ariz. 288, 299 ¶ 42 (App. 2011)). The superior court did not abuse its discretion when it found father did not show DCS acted intentionally to commit fraud on the court.

**III.** **The superior court did not abuse its discretion when it declined to draw an adverse inference against DCS.**

**¶28** Father argues the superior court should have drawn an adverse inference against DCS because of the untimely disclosure of the internal email communications about DOJ's investigation. The superior court has broad discretion in deciding disclosure and discovery issues. *Marquez v. Ortega*, 231 Ariz. 437, 441 ¶ 14 (App. 2013). The appellate courts leave the choice of appropriate sanctions for failure to disclose to the superior court's sound discretion. *See id.*

**¶29** The cases on which father relies do not establish the superior court abused its discretion when it did not draw an adverse inference against DCS. *See generally Melissa W. v. Dep't of Child Safety*, 238 Ariz. 115 (App. 2015); *Gordon v. Liguori*, 182 Ariz. 232 (App. 1995). Both *Melissa W.* and *Liguori* discuss drawing an adverse inference from a party's decision to withhold testimony, not a party's failure to disclose. *See Melissa W.*, 238 Ariz. at 117 ¶ 6; *Liguori*, 182 Ariz. at 237.

**¶30** In *Melissa W.*, the court affirmed the superior court's decision to draw an adverse inference against a parent who refused to testify at the termination hearing. 238 Ariz. at 117 ¶ 6. As the court said, "[a superior] court's drawing a[n adverse] inference when a parent fails to testify at a severance hearing is particularly appropriate. A central issue at such hearings is whether severance of parental rights is in the child's best interests." *Id.* Here, the evidence is the fact of a DOJ investigation, nothing more. Nothing about that fact makes it "particularly appropriate" for the superior court to draw an adverse inference here.

¶31        *Ligouri* is similarly unhelpful to father. *Ligouri* addressed the factors a court should consider when it decides whether to draw an adverse inference from a party's decision not to call a particular witness. 182 Ariz. at 236 (identifying 3 factors: (1) was the witness under that party's control, (2) was the testimony something that party naturally would "be expected to produce if it were favorable," and (3) was "the existence or nonexistence of a certain fact [] uniquely within the knowledge of the witness"). *Ligouri*'s 3-factor analysis has no application here.

¶32        In contrast here, DCS did not disclose the existence of a DOJ investigation. Though father's arguments make much of DOJ's findings, those findings came long after father consented. As noted above, father did not come forward with evidence to show DCS acted with intent to deprive father of the information. And the information was merely the fact of an investigation, not the ultimate findings. The superior court also found that even if father (or at least his counsel) did not know about the investigation earlier in the case, they should have. In particular, the superior court documented a DOJ trial attorney attending 4 court hearings before father signed the consent, including the hearing in which he did so.

¶33        The superior court thus did not abuse its discretion when it did not draw an adverse inference against DCS. Reasonable evidence supports that outcome. *See Brionna J.*, 255 Ariz. at 478 ¶ 29.

## CONCLUSION

¶34        The court affirms the superior court's denial of father's second motion to set aside the order terminating his parental rights to the child.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:          JR

9